Jackie Barron WILSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 70981.

Court of Criminal Appeals of Texas, En Banc.

June 9, 1993.

Rehearing Denied Oct. 6, 1993.

**60**

John D. Nation and R.K. Weaver, on appeal only, Dallas, TX, for appellant.

John Vance, Dist. Atty., and A. Wetherholt, A. Beach and J. Sims, Asst. Dist. Attys., Dallas, TX, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

BAIRD, Judge.

Appellant was convicted of capital murder pursuant to Tex.Penal Code Ann. § 19.-03(a)(2).[1] The jury returned affirmative answers to the two issues submitted pursuant to Tex.Code Crim.Proc.Ann. Art. 37.071(b).[2] Punishment was assessed at death. *Id.* at (e). Appeal to this Court is automatic. *Id.* at (h). Appellant presents twenty points of error including a challenge to the sufficiency of the evidence.[3] We will reverse.

The first issue asked: Was the conduct of the defendant that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

The second issue asked: Is there a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

---

1. Tex.Penal Code Ann. § 19.03 provides in part:
   (a) A person commits an offense if he commits murder as defined under Section 19.02(a)(1) of this code and:
   (2) the person intentionally commits the murder in the course of committing or attempting to commit kidnapping ...

2. Appellant was convicted on September 27, 1989.· However, on September 1, 1991, Tex. Code Crim.Proc.Ann. art. 37.071 was amended. All references herein will be to the statute as it appeared at the time of appellant's trial.

3. Appellant's brief discusses twenty-one points of error, however, the text omits an eighteenth point of error. Therefore, we will respond ac-

## I. THE FACTS

A thorough review of the record is necessary to address the points of error raised by appellant.

The indictment alleged in part:

[Appellant] knowingly and intentionally cause[d] the death of [deceased] ... by CAUSING THE ASPHYXIATION OF THE [Deceased] IN SOME WAY OR MANNER, AND BY MEANS, INSTRUMENTS, OR WEAPONS THE EXACT NATURE AND DESCRIPTION WHICH IS TO THE Grand Jurors unknown and by crush force injury to the [deceased] caused by striking the [deceased] with a motor vehicle and the [appellant] intentionally did cause the death of the [deceased] while the said [appellant] was in the course of committing and attempting to commit the offense of KIDNAPPING [deceased]...."

On November 30, 1988, at approximately 6:55 a.m., a truck driver spotted what appeared to be a doll to the side of a narrow two lane road in Grand Prairie. Upon closer inspection, the driver discovered the deceased and stopped a passing school bus, whose driver then reported the discovery.

At approximately 7:00 a.m., Grand Prairie motorcycle police officer Kim Wolf arrived at the scene. Wolf described the location as an isolated area, without houses, and "not widely traveled or used." The deceased was very cold and covered with frost. A crime scene technician testified that the deceased was wearing a tee shirt and shorts. A pair of blood-stained panties, later identified as belonging to the deceased, was found at the scene. The deceased was lying face down and appeared to have been run over by an automobile. Distinct tire imprints were visible across the deceased. The dirt and grass around the deceased also showed distinct tire tracks.

Dr. M.G.F. Gilliland, medical examiner at the Southwest Institute of Forensic Sciences, performed an autopsy on the deceased. Gilliland observed injuries indicating an asphyxial injury that came about by either a compression pressure on the neck, the blocking of the nose or mouth, or some combination of the two. Gilliland found numerous incidental injuries, all associated with strangulation or smothering. Gilliland also found what she described as "extensive breaking of the bones of the skull ... down, through the base of the skull, which is a fairly dense bone...." Gilliland's testimony also indicated that part of the brain was torn away and that the deceased had inhaled blood through a wound to the airway.

The deceased was covered with grease and grime. Gilliland observed tire tread marks in both the dust on the body and in the skin. Specifically, Gilliland found a tire mark with a distinctive "V" pattern on the inside of the deceased's right leg. Along with the "V" pattern, Gilliland also found a different set of marks that had "line like," right angled, marks. The marks appeared as a "very sharp set of marks, [forming a] very distinctive pattern" in the deceased's skin.

According to Gilliland, the deceased's vagina had extensive internal and external injuries, including "a tear up high, in the vagina, next to the neck of the womb, the cervix." The deceased's anus had very extensive bruising and splitting of the skin as well as evidence of tearing. There was also bleeding inside the rectum that extended up two inches. Gilliland testified that the injuries were consistent with a grown man having anal intercourse with the deceased and might be consistent with the digital penetration of the vagina. The injuries occurred before the deceased's death.

Gilliland attributed the deceased's death to asphyxia and blunt force and crushing injuries to the head and concluded that either the asphyxia or the head injury could have caused the deceased's death. According to Gilliland, if one injury had not caused the deceased's death, the other injury would have. [p. 836]. The injuries were illustrated to the jury through photographs and diagrams.

Carolyn Van Winkle, a forensic serologist from the Southwest Institute of Forensic Sciences, testified that spermatozoa were detected on the vaginal and anal swabs from the deceased even though no seminal fluid

cording to the twenty points of error as numbered in appellant's table of contents.

was recovered. However, seminal fluid was recovered from the deceased's panties, but not in sufficient quantity to analyze.

Officer Jim Greenwell, a member of the crime scene search unit of the Arlington Police Department, testified that he went to the Arlington Village Apartments to investigate a report of a missing five year old girl. The deceased lived in apartment fourteen, and, as will be discussed *infra*, was last seen alive in her bedroom at approximately 1:30–2:00 a.m. on November 30, 1988. After hearing of the discovery of the deceased, Greenwell left the apartment and drove approximately twelve minutes to the deceased's location. Near the deceased, Greenwell found "acceleration marks," described as "the transfer of burnt rubber on the grass," just west of a blood spot. Greenwell testified that someone driving a vehicle would have enough time and distance to maneuver their vehicle to avoid hitting the deceased.

Several days after the deceased's death, the police acquired appellant's name and fingerprints. When appellant was arrested on December 7 at an Irving apartment, police noticed a red, 1975 Mercury Cougar (hereafter referred to as "the vehicle") at that location. The police obtained a consent to search from the vehicle's owner, Frank Uriqueza, and impounded the vehicle. The vehicle had three Eagle G.T. tires and one Nito tire. Upon a more thorough examination, Greenwell found the Nito tread pattern appeared consistent with the pattern on the deceased's leg and the G.T. pattern appeared consistent with the pattern on the deceased's shoulders.

Greenwell's examination of the undercarriage of the vehicle discovered hair imbedded in the grease behind the left front wheel, on the transmission housing between the two front wheels, near the left rear wheel, the rear axle, and below the driver's door. Greenwell also found what appeared to be flesh and hair near the left rear tire. On the fender just behind the front left tire, Greenwell found what appeared to be blood. Evidence from the undercarriage was examined, photographed, removed where possible, and submitted to the Institute of Forensic Sciences for examination and analysis. Greenwell obtained tire tread impressions from the vehicle and testified to the differences between Nito and G.T. tire treads and to the placement of the tires on the vehicle.

After examining the exterior, Greenwell systematically searched and vacuumed the interior of the vehicle. The search produced loose hairs from the front left quadrant of the interior. The material Greenwell collected was turned over to the Institute of Forensic Sciences for analysis.

Charles Linch, a trace evidence analyst with the Southwestern Institute of Forensic Sciences, testified that he received a number of evidence samples in connection with the instant case including the samples collected by Greenwell in the search of the vehicle. For comparison purposes, Dr. Gilliland submitted a known "hair standard" from the deceased. Linch compared the various hair and fiber samples with the known hair standard. Linch concluded that the hair samples from the vehicle came from the deceased. Additionally, carpet fibers from inside the vehicle and a hair from deceased were found in a sample from the vehicle's undercarriage. Linch agreed that such a finding was consistent "with the head hair of [deceased] coming into contact at some point in time, with those [carpet] fibers inside the vehicle."

Max Courtney, an expert in tire tread comparisons and impressions, testified concerning the vehicle's tread marks. Courtney examined the tires on the vehicle and compared their tread patterns with photographs of the tire tread impressions on the deceased. Courtney concluded that the Nito tire impression on deceased's leg shared "a correspondence of class characteristics" with the Nito tire tread pattern on the vehicle. Additionally, all "observable class characteristics" of the vehicle's Eagle G.T. tires matched the impressions on the deceased's shoulders. Class characteristics, those identifying features common to all tires of that class, were preserved in the deceased's skin. However, the deceased's body was not conducive to the preservation of "individual characteristics," which would identify which particular tire of a given class actually caused the injuries.

Frank Uriqueza, the vehicle's owner, testified that he bought three Eagle G.T. tires for

the vehicle and those tires had been on the vehicle for two months prior to the search of the vehicle. Uriqueza testified that appellant borrowed the vehicle on November 29, 1988, and returned the vehicle and awakened Uriqueza shortly before 4:40 a.m. on November 30, 1988. Uriqueza got out of bed and asked appellant where the vehicle was parked. Appellant responded that the vehicle was parked in a different place than usual.

The deceased's mother came home from work about 11:20 p.m. on November 29, 1988. Both of her children slept in one bedroom. Joe Martinez, the live-in babysitter, slept on the couch in the living room. At midnight, the deceased was asleep in bed. The deceased's mother testified that the temperature was warm in the deceased's bedroom, indicating that the window immediately above the deceased's bed was closed. The deceased's mother further testified that the window in the children's room had a lock at the top of the window that she had installed herself in addition to the regular lock at the bottom of the window. Additionally, the apartment complex had repaired the window in the children's bedroom one month prior to the deceased's death. The deceased's mother had cleaned the deceased's bedroom before going to work on November 29, and had noticed that the window was locked. The window had no screen.

Early on November 30, Martinez and two friends were outside the apartment near the deceased's window. The deceased's mother talked to Martinez and friends for a "couple of minutes" through her bedroom window and then saw them leave through a gate. The deceased's mother went to sleep sometime after 1:25 or 1:30 a.m. after telling Martinez to come inside.

After the deceased's mother awoke at 8:00 a.m., she felt a cold draft coming from the children's bedroom, went in to locate the draft, and realized the deceased was missing. The deceased's mother noticed that the window pane by the deceased's bed was broken. The curtains were torn and "messed up." When she and Martinez could not find the deceased, she called the Arlington Police Department.

Arlington police detective Mike Bosillo arrived at the apartment at 8:40 a.m. and noticed the opened, broken window pane and bent curtain rod above the deceased's bed. While at the apartment, Bosillo learned that a young girl's body had been found in Grand Prairie. Bosillo carried a photograph of the deceased to Grand Prairie, nine miles from the deceased's apartment in Arlington, and identified the body as the deceased.

Arlington Police crime scene search officer Glenn Cole examined the deceased's apartment for evidence. The examination revealed fingerprints on several pieces of broken glass from the bedroom window. Cole found a patent fingerprint on a piece of glass under a doll beneath the bed covers.[4] Cole testified the window was broken from the outside. Outside the deceased's window, Cole collected a piece of weather stripping pulled from the window and found fingerprints on several pieces of glass.

Cole compared the recovered fingerprints to known fingerprints of appellant and matched the fingerprint on the glass found in the deceased's bed to appellant. Cole also matched fingerprints from two other pieces of glass to appellant. On a piece of glass found outside, Cole determined that appellant's thumb print appeared on one side of the fragment and the appellant's index and middle fingerprints appeared on the other side of the same fragment. Cole testified that the evidence was consistent with appellant breaking out a portion of the window, placing his thumb on one side of a piece of broken glass and his second and third fingers on the other side of the same piece of glass, and lifting the glass out of the window.

Along with the broken glass, police also recovered five blood samples from the apartment area. Cole collected three suspected blood samples from the window sill in the deceased's bedroom and one from the wall by the deceased's bed. Cole recovered a fifth blood sample from the outside window sill. Cole submitted the samples for analysis,

---

4. A "patent" fingerprint is one apparent to the naked eye without need for developing. A "latent" print is one that must be treated to become visible.

however, the Institute determined the samples were too small to fully analyze. Van Winkle, the Institute serologist, testified that examination of the samples confirmed human blood, but could not reveal any person's identity.

An eleven-year-old witness testified that in June, 1988, appellant and the deceased attended a birthday party at the apartment complex. During the party, appellant stroked the deceased's hair and commented on how pretty the deceased's hair was.

Martinez, the deceased's babysitter, testified that appellant had lived in the apartment complex previously. According to Martinez, the deceased avoided appellant when appellant was around the apartment. Martinez last saw appellant in the complex on Halloween, 1988, approximately one month before the deceased's death.

Martinez testified that the deceased's mother returned home from work on November 29 at about 11:30 p.m. Around 11:50, the deceased was asleep in her bed. Martinez left the apartment. When Martinez returned at approximately 2:00 a.m., he noticed that the deceased was uncovered. Martinez covered the deceased and noticed that the window above the deceased's bed was closed and locked.

Antonio Lopez testified that appellant and Victor Herrera arrived at Lopez's apartment on November 29 with a twelve pack of beer and a bottle of Seagram's liquor. Lopez testified that appellant and Herrera arrived in the vehicle. Lopez saw appellant ingest one line of cocaine. Appellant told Lopez that the vehicle was a "fast car" before appellant "peeled out" of the parking lot. Lopez observed the smoke caused by the vehicle's spinning tires at approximately 10:45 p.m. as appellant and Herrera drove away. Appellant was driving the vehicle.

Carol Gonzales testified that appellant and Herrera arrived at her apartment at approximately 11:00 p.m. on November 29 with beer and Seagram's. Gonzales requested that appellant leave after appellant became angry and got into an argument with a friend of Gonzales. Appellant told Gonzales that he did not feel welcome, and left some time

between midnight and 1:00 a.m. Appellant "peeled out" when leaving in the vehicle.

Able Loya worked at an Arlington gas station approximately one mile from Gonzales' apartment and was working his regular shift, from 4:00 p.m. to midnight, on November 29. Loya was still at the station at approximately 12:30 a.m. on November 30 when appellant and Herrera drove into the station. Loya remembered seeing the vehicle before and observed that appellant was driving the car when it pulled into the station. Loya had also seen appellant driving the vehicle on prior occasions. Appellant got out of the car and pumped $2.00 worth of gas. Loya talked to appellant briefly and accepted payment for the gas. Appellant also gave Loya a beer.

Victor Herrera testified that he was with appellant on November 29, and that at about 6:30 p.m., appellant asked Herrera if he wanted to buy some cocaine. Appellant was aware that Herrera was carrying $110.00. The two purchased cocaine from a friend of appellant's and ingested some. Herrera and appellant had used cocaine and other drugs on previous occasions.

On January 4, 1989, police obtained a warrant to search appellant's apartment for specific articles of clothing. At trial, Herrera identified an exhibit as the sweatshirt worn by appellant on the night of November 29, 1988, and described appellant's pants. However, the described pants were not discovered in the search of appellant's apartment. Herrera also identified the vehicle in which Herrera and appellant travelled on November 29. Herrera testified that appellant was the person driving the vehicle on the night of November 29 and the morning of November 30.

Appellant and Herrera bought beer and Seagram's at a liquor store. While waiting for Tony Lopez to arrive home, the two drank beer and liquor and ingested three or four lines of cocaine. After Lopez arrived, the trio continued drinking and ingesting cocaine and marijuana until about 10:30 p.m. Herrera requested that appellant take him home and the two left. However, appellant took Herrera to Gonzales' apartment. Herrera again wanted to leave and go home be-

cause he was bored and did not know any of appellant's friends. After leaving the apartment, the pair stopped by a gas station and then appellant took Herrera home. Herrera returned home at 12:20 a.m.

Susan Jennings, one of the deceased's neighbors, testified that appellant and two companions came to her apartment some time after 1:00 a.m. on November 30. A neighbor visiting Jennings left after appellant appeared. Appellant and his companions chatted in Jennings's apartment for a few minutes before Jennings asked them to leave. Jennings locked the door behind the trio, but did not check her window which she knew was locked before appellant arrived. After appellant left, Jennings laid down fully clothed on her couch and went to sleep. Jennings awakened when she realized someone was fondling her. At first, Jennings thought it was her husband, but when she awakened from her "groggy" state, she recognized appellant and started screaming. Jennings noticed that her window was up. Appellant began claiming that Jennings had let him in. Jennings became more irate and ordered appellant out of the apartment. Appellant offered Jennings some "speed" in return for sexual favors. Jennings again ordered appellant out of her apartment and noticed that appellant headed in the direction of deceased's apartment. Jennings was unaware of any other incident until the next morning, when the Arlington police came to her door to inquire about Jennings' knowledge of the missing deceased.

## II. SUFFICIENCY OF THE EVIDENCE

In points of error one, two and thirteen, appellant contends the evidence is insufficient: a) to show that he knowingly and intentionally caused the death of the deceased; b) to show that he caused the death

in the course of committing and attempting to commit kidnapping; and c) to support an affirmative finding to the first punishment issue.[5]

■ To determine the sufficiency of the evidence, appellate courts must determine whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316–319, 99 S.Ct. 2781, 2783–2788, 61 L.Ed.2d 560 (1974); *Butler v. State*, 769 S.W.2d 234, 239 (Tex.Cr.App.1989). Cases based on circumstantial evidence are reviewed under the same standard as direct evidence cases. *Butler*, 769 S.W.2d at 238; *Carlsen v. State*, 654 S.W.2d 444, 449 (Tex. Cr.App.1983). If the reviewing court finds a reasonable hypothesis other than the guilt of the accused, the reviewing court cannot say that the guilt was proven beyond a reasonable doubt. *Willis v. State*, 785 S.W.2d 378, 380 (Tex.Cr.App.1989) (and cases cited therein). However, as we said in *Carlsen*:

> It is not required that the circumstances should, to a moral certainty, actually exclude every hypothesis that the act may have been committed by another person, but that the hypothesis is a reasonable one consistent with the circumstances and the facts proved. [citations omitted.] Each fact need not point directly and independently to the guilt of the accused, as the cumulative effect of all the incriminating facts may be sufficient to support the evidence. [citations omitted.] However, proof which amounts only to a strong suspicion or mere probability is insufficient. [Emphasis added.][6]

*Carlsen*, 654 S.W.2d at 447,

Finally, in reviewing the sufficiency of the evidence, an appellate court's role is not to reweigh the evidence as the thirteenth juror.

---

**5.** Appellant's first point of error states:
The evidence is insufficient to establish that appellant knowingly and intentionally caused the death of the decedent.
Appellant's second point of error states:
The evidence is insufficient to establish that appellant caused the death of the decedent while appellant was in the course of committing and attempting to commit the offense of kidnapping.

Appellant's thirteenth point of error states:
The evidence was insufficient to support the jury's finding as to the first special issue.

**6.** We are using the *Carlsen* standard because this case was tried prior to our decision in *Geesa v. State*, 820 S.W.2d 154 (Tex.Cr.App.1991).

*Blankenship v. State,* 780 S.W.2d 198, 207 (Tex.Cr.App.1990) (op. on reh'g.).

### A. Knowingly and Intentionally Cause The Death

■ The evidence clearly establishes that appellant drove the vehicle from the night of November 29, 1988, until shortly before 4:40 a.m. on November 30, 1988, within the time frame of the deceased's disappearance and death. Appellant was in the deceased's apartment complex some time after 1:00 a.m. on November 30, when Jennings threw appellant out of her apartment. Jennings last saw appellant heading towards the deceased's apartment. The deceased was last seen safely in her bed as late as 2:00 a.m. on November 30, 1988.

The evidence demonstrates that appellant broke the deceased's bedroom window leaving his fingerprints on various pieces of glass, including one found in the deceased's bed. The carpet fiber and hair comparisons establish that the deceased was inside the vehicle. The evidence shows the person driving the vehicle would have had enough time and distance to avoid running over the deceased. Gilliland testified that the deceased's death was caused by either asphyxiation or blunt trauma to the head, or both. The hair samples from the undercarriage of the vehicle and the vehicle's two different tire imprints found on the deceased establish that the deceased was struck by the vehicle. The only reasonable hypothesis from the record before us is that appellant knowingly and intentionally ran over the deceased with the vehicle causing the blunt trauma which resulted in the deceased's death.

After viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson,* 443 U.S. 307, 316–319, 99 S.Ct. 2781, 2787–2788, 61 L.Ed.2d 560 (1974); *Butler,* 769 S.W.2d 234, 239 (Tex.Cr.App. 1989). Indeed, we find that a rational trier of fact could not have found another hypothesis consistent with the facts proved. Appellant's first point of error is overruled.

### B. The Kidnapping

■ Appellant's second point of error contends the evidence is insufficient to demonstrate that the deceased died while appellant was in the course of committing or attempting to commit the offense of kidnapping. A person commits the offense of kidnapping if he intentionally or knowingly abducts another person. Tex.Penal Code Ann. § 20.03(a). "Abduct" means to restrain a person with intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found; or, (B) using or threatening to use deadly force. Tex.Penal Code Ann. § 20.01(2).

"Restrain" means to restrict a person's movements without consent, so as to interfere substantially with his liberty, by moving him from one place to another or by confining him. Tex.Penal Code Ann. § 20.01(1). Restraint is without consent if it is accomplished by: (A) force, intimidation, or deception; or, (B) any means, including acquiescence of the victim, if he is a child less than fourteen years of age or an incompetent person and the parent, guardian, or person or institution acting *in loco parentis* has not acquiesced in the movement or confinement. Tex.Penal Code Ann. § 20.01(1).

■ The law imposes no minimum requirement for restraint other than that the interference with the person's liberty be substantial. *Rogers v. State,* 687 S.W.2d 337, 342 (Tex.Cr.App.1985). Where a defendant forcibly drives another person to various parts of a city and keeps that person isolated with intent to prevent liberation by anyone who might be capable of helping the person, abduction is proven. In such a situation, the claim that the person was not secreted or held in a place where the person was not likely to be found is of no importance. *Fann v. State,* 696 S.W.2d 575 (Tex.Cr.App.1985).

■ We hold that the evidence in the case at bar is sufficient to establish that appellant kidnapped the deceased. The evidence establishes that appellant abducted the deceased by intentionally restraining her in a place where she was not likely to be found, namely by taking her from her bedroom in Arlington to an isolated area of Grand Prai-

rie. The deceased could not consent to the restraint because she was under the age of fourteen and the deceased's mother did not consent to appellant taking the deceased from the apartment. *See, Earhart v. State,* 823 S.W.2d 607 (Tex.Cr.App.1991).

The only reasonable hypothesis from the record is that appellant removed the deceased from her bedroom and drove the deceased to the isolated area of Grand Prairie where her body was later discovered. When viewed in the light most favorable to the verdict, we find the evidence sufficient to establish beyond a reasonable doubt that appellant caused the death of the deceased while in the course of committing and attempting to commit the offense of kidnapping. *Jackson,* 443 U.S. 307, 316–319, 99 S.Ct. 2781, 2787–2788, 61 L.Ed.2d 560 (1974); *Butler,* 769 S.W.2d 234, 239 (Tex.Cr.App. 1989). Therefore, appellant's second point of error is overruled.

### C. The First Punishment Issue

■ The first punishment issue under Tex.Code Crim.Proc.Ann. art. 37.071(b)(1) asks:

> Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

Both appellant and the State rely primarily on their arguments in the first point of error.

As noted in part I. of this opinion, Dr. Gilliland observed an asphyxial injury that was caused by either a compression pressure on the neck, the blocking of the nose or mouth, or some combination of the two. Gilliland also found numerous injuries associated with strangulation or smothering. Furthermore, the deceased suffered extensive breaking of the bones of the skull, down through the base of the skull. According to Gilliland the deceased's death was caused by either the asphyxia or the head injury. If one injury had not caused death, the other injury would have.

In short, the record reveals the defendant inflicted injuries sufficient to cause the death in either of two ways. He caused the death by smothering the deceased and running over her with the vehicle. When viewed in the light most favorable to the jury's answer to the first punishment issue, we find the evidence sufficient to establish beyond a reasonable doubt that appellant's conduct in causing the death was committed deliberately and with the expectation that the death of the deceased would occur. *See, Milton v. State,* 599 S.W.2d 824 (Tex.Cr.App.1980). Appellant's thirteenth point of error is overruled.

### III. VENIRE MEMBER LEWIS

#### A.

■ Appellant's contends, in his fourteenth point of error, that the trial judge erred in granting the State's challenge for cause to venire member Boyd Lewis.[7] During its voir dire examination, the State inquired whether Lewis could answer the second punishment issue affirmatively based solely on the facts of the case before him:

> STATE: ... The law contemplates that a juror could answer that question yes, based just on the facts of the crime itself, the one he's on trial for. In other words, that a jury could learn enough about an individual from that one period of time there that he's on trial for to answer that question yes. In other words, how he acted, the type of victim he chose, how unnecessarily violent or cruel was the killing, how he acted afterwards.
>
> Do you think that can be done; or would you think that you would have to see some kind of prior track record or history, as you say, to answer that? How would you feel about that, if all the evidence you had were just the facts of the offense itself?

**7.** Specifically, appellant's Fourteenth Point of Error states:

> The trial court erred in granting the State's challenge to juror Boyd Lewis for cause where

there was no showing that the juror would be biased against the law that the State was entitled to rely on.

LEWIS: No, I don't think so. I couldn't come to a conclusion.

STATE: Okay. You would have to know how a person lived their life up until that point and then, as you said, even afterwards?

LEWIS: Yes.

STATE: Okay. You know, its possible— And the law contemplates this also. — that you could have a defendant found guilty of capital murder that had no prior bad acts at all, had been a choir boy up until then.... Let's say you heard about a horrible crime, the facts were very bad, but you were to hear during punishment from either the State or the defense that the defendant had never been in trouble before, there's no one to come in and tell you he's got a bad reputation. If you didn't hear anything like that and even though the facts of the crime itself were very bad, do you think that you could never answer that question yes? Or tell me what—how you feel about that?

LEWIS: You're talking about Question Number 2; right?

STATE: Yes, sir.

LEWIS: Okay. An act of violence—of criminal violence, with just the act itself—

STATE: Yes, sir.

LEWIS: —and proven that it was committed, you can come to a conclusion, yes or no. Yes.

STATE: Okay. So, you think you could answer that question. If the person had no prior history, or no prior criminal record or bad acts, you could base your answer and answer it yes in some circumstances on just the facts of the case itself, just the facts you had heard about the killing in question.

LEWIS: You could answer the question, but you—it's a decision you would have to make. You can't—And you could be wrong or you could be right because you cannot—Well, I could not say that because an individual committed a crime once that they would do it again; so, I—

I couldn't answer it. It would just be a judgment.

Both the judge and the State continued this line of questioning. Lewis restated he could, *with evidence additional to the facts of the instant case,* affirmatively answer the second issue. The State inquired further:

STATE: What I'm wanting to know is would you always require—before you could ever answer that second question yes, would the State have to bring you some type of prior history or criminal record of the defendant for you to answer it yes?

LEWIS: And after the—the criminal offense had been committed. I cannot say that someone would be a continuing threat to society....

&ast; &ast; &ast; &ast; &ast; &ast;

STATE: ... Do you think that you could say—or answer that question that there's a probability that he'll constitute a continuing threat to society if you had the facts of the case and you also had a prior history, like you knew he had been in trouble before? Are there some situations that you believe that question—you could answer that question?

LEWIS: Yes. Yes.

Lewis later stated he could affirmatively answer the second issue if the State provided sufficient evidence "without a reasonable doubt," that appellant was guilty and capable of committing other acts of violence against society. [2353] After the conclusion of Lewis' voir dire, the State challenged Lewis for cause because he could not answer the second issue solely based upon the circumstances of the offense before him. The State argued:

... He stated he could never answer that question—we could never prove to him to his satisfaction that he would be a—that the defendant would be a future danger and continuing threat unless we brought to him prior—in fact, he stated prior history and then history after the offense, that he could never answer that question based on the facts and circumstances alone.

&ast; &ast; &ast; &ast; &ast; &ast;

... That's what he's going to require as proof. Obviously, if we prove that to him and give him that type of evidence he can answer it yes, but up until then he will—he says he cannot answer that question.

Although the State failed to articulate a legal basis for the challenge at the time of the voir dire examination, the State now contends the challenge was proper under Tex. Code Crim.Proc.Ann. art. 35.16. Art. 35.16 provides, in part:

(b) A challenge for cause may be made by the State for any of the following reasons:

3. That he has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment.

Appellant's attorney objected to the State's challenge for cause. The trial judge overruled the objection and Lewis was excused.

### B.

Appellant contends Lewis specifically stated that he could consider evidence of appellant's continuing threat to society and could, with sufficient evidence, answer the second issue affirmatively. Appellant further contends while a jury *may* consider the evidence of the instant offense sufficient to affirmatively answer the second issue, the law does not require that the juror *must* consider the evidence of the offense sufficient without hearing additional testimony.

The State contends the trial judge properly granted the State's challenge for cause because Lewis could never answer the issue affirmatively based only on the facts of the case. The State contends they are entitled to rely on law that holds that the second issue *can* be proved based on the facts of the charged offense alone.

Substantial case law allows the facts of a particular capital case, if "severe enough," to support an affirmative jury verdict on the second punishment issue. *Garrett v. State,* 851 S.W.2d 853, 859 (Tex.Cr.App.1993), and cases cited therein. However, there is no *requirement* that an individual juror answer the second issue affirmatively solely on the facts of that particular offense. *Id.*

... [T]hat the law permits jurors to find future dangerousness in some cases on the facts of the offense alone does not mean that *all* jurors must do so, or even consider doing so. A particular juror's understanding of proof beyond a reasonable doubt may lead him to require more than the legal threshold of sufficient evidence to answer the second special issue affirmatively.... [A]n individual juror must determine what proof beyond a reasonable doubt means to him, for the law does not tell him.

*Id.,* at 859.

... That an individual venireman would set his threshold of reasonable doubt higher than the minimum required to sustain a jury verdict does not indicate he has a bias or prejudice against the law.

*Id.,* at 860.

As we recently held in *Garrett,* a venireman is not subject to challenge for cause because he believed, under the reasonable doubt standard, evidence in addition to the offense before him was needed to answer the second punishment issue affirmatively. *Garrett,* at 860. Error in granting a State's challenge for cause in a capital case is reversible. It is irrelevant whether the State had peremptory challenges remaining at the conclusion of the voir dire. *Grihalva v. State,* 614 S.W.2d 420 (Tex.Cr.App.1981), *Bell v. State,* 724 S.W.2d 780 (Tex.Cr.App.1986). *Garrett,* at 861.

Finding the disposition of this case controlled by *Garrett,* the judgment is reversed and the cause is remanded to the trial court.

McCORMICK, P.J., and WHITE, J., dissent.

CAMPBELL, J., dissents for the reasons stated in his dissenting opinion in *Garrett v. State,* 851 S.W.2d 853 (Tex.Cr.App.1993).

MILLER, Judge, concurring.

I agree with the majority opinion that the fourteenth point of error in this cause is governed by our recent pronouncement in *Garrett v. State,* 851 S.W.2d 853 (Tex.Crim. App.1993), motion for reh'g denied. This

cause is factually indistinguishable from *Garrett*, and thus the legal result the same. I therefore join the majority opinion. I write separately to articulate my reasoning on this point.

In *Garrett*, the State challenged for cause a prospective juror who stated he could not answer affirmatively the second punishment issue based on the facts of the capital offense alone. The trial judge granted the State's challenge, which ruling the defendant objected to at trial and challenged on appeal. On direct appeal, the State relied upon case law from this Court [1] addressing the sufficiency of the evidence to support the jury's affirmative answer to the second punishment issue and held that the facts of the offense, if severe enough, will support a jury's affirmative answer on this issue. The Court noted that this is an appellate standard of review, the minimum legal threshold of sufficient evidence to answer the second punishment issue, and it was not error for a prospective juror to require more evidence than that in his understanding of proof beyond a reasonable doubt. *Id.*, at p. 859. Thus, the Court held the trial judge reversibly erred in granting the State's challenge for cause. After reconsidering the *Garrett* opinion in the cause at bar, I am convinced its reasoning is sound.

Our interpretation of Texas' sentencing statute recognizes that more evidence than the mere facts of the offense may be necessary for the State to prove beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. The "facts of the offense" is the minimum amount of evidence the State must present to legally obtain an affirmative answer to the second special issue. A juror does not evidence a bias against the law upon which the State is entitled to rely merely because he would require more than the minimum amount of evidence.[2] As the juror in this cause and in *Garrett* indicated, they could consider the death penalty as an appropriate punishment for one convicted of capital murder but they needed more evidence than just the facts of the case to determine that the convicted defendant deserved the death penalty. These prospective jurors did not reveal an inability to follow the law and their oath. Neither did their viewpoint of when the death penalty would be appropriate punishment substantially impair their ability to serve as jurors in a capital case. *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The juror who requires more evidence than the facts of the offense in order to answer special issue # 2 affirmatively does not show an inability to consider the entire range of punishment (life or death) in the capital case; this type juror just needs more evidence to make a reasoned decision regarding the ultimate penalty. *See Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

The State is not entitled to a death sentence upon the defendant's conviction for capital murder. Nor is the State entitled to twelve jurors who would only require the legal, minimum quantum of evidence for assessment of the death penalty.[3] The State is only entitled to jurors who can consider the entire range of punishment in an appropriate

1. *See Garrett*, at p. 859, n. 3, 4.

2. At the punishment phase of a capital murder trial, the State (and the defendant) may present evidence "as to any matter that the court deems relevant to sentence[.]" Art. 37.071, § 2, V.A.C.C.P. This evidence may include the prior criminal record of the defendant, his general reputation, his character, psychiatric testimony, etc. The State may, however, choose not to introduce any evidence at punishment but merely re-offer its evidence from guilt/innocence.

In my view, a venireperson who would require evidence that falls outside the realm of evidence that the State generally is allowed to bring (i.e. that the defendant testify or that matters privileged under Article V of the Rules of Criminal Evidence be introduced) probably does evidence a bias against the law upon which the State is entitled to rely. The same is true where a venireperson requires evidence that constitutes another crime, *e.g.*, where the venireperson requires in a Penal Code § 19.03(a)(2) capital murder case that the State show a serial killing as contemplated by § 19.03(a)(6).

3. The State may, however, peremptorily strike those prospective jurors who could give the death penalty (i.e. answer the punishment issues affirmatively) but only on a greater quantum of proof.

case, and the jurors' concept of an appropriate case may encompass evidence that the State is permitted to introduce at trial, such as prior criminal record, character evidence, etc. Neither the juror in this case nor in *Garrett* expressed during his voir dire examination an inability to assess the death penalty per se; each merely expressed his opinion that a person who commits capital murder does not, without more, merit a finding that he will be a continuing threat to society as contemplated by special issue # 2. I find no bias against the law on the part of these prospective jurors; indeed, I believe that they would be thoughtful, conscientious jurors.

With these comments, I join the majority opinion.

MEYERS, J., joins this opinion.