Opinion issued November 20, 2008









Opinion issued November
20, 2008

 

 

 

 



 

 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-07-00985-CR

                                                          

 



JASON EDWARD MCMASTER, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 

 



On Appeal from the 185th District Court

Harris County, Texas

Trial Court Cause No. 1088336 

 

 



MEMORANDUM OPINION

           A jury found Jason Edward
McMaster guilty of capital murder.  Because the State chose not to seek the
death penalty, the trial court imposed a sentence of life imprisonment. 
McMaster appeals his capital murder conviction, contending that (1) the trial
court erred in allowing the State to pose a hypothetical to its expert that
varied from the facts actually proven in the case, (2) his trial counsel failed
to preserve erroneous evidentiary rulings for appeal, and thus rendered
ineffective assistance in violation of McMaster’s rights under the Sixth
Amendment to the United States Constitution, and (3) the evidence is not
factually sufficient to sustain his conviction.  Finding no error, no ineffectiveness,
and no insufficiency, we affirm.

Background

One evening in December
2005, Kentrell Smith visited his cousin, Ricky Smith, at the La Quinta hotel
where Smith was staying in southwest Houston, to play videogames.  Kentrell
Smith also expected a visit from another cousin, Corey Brown.  Brown soon
arrived at the hotel, accompanied by Jared Daniel, Joseph Kemp, and McMaster. 
The men smoked marijuana, and Daniel also had taken Ecstasy.  

Both Daniel and McMaster
carried handguns, a 9‑millimeter, and a 10-millimeter, respectively. 
According to Pasadena Police Department Sergeant King, who investigated the
case, a 10-millimeter handgun is an unusual weapon; he had spent nineteen years
as a police officer before encountering a crime scene where a 10-millimeter
handgun was used or arresting someone in possession of one.  

McMaster asked Brown to
call a drug dealer so that McMaster could rob the dealer and then kill him. 
Brown refused to make the call.  McMaster prodded Brown a few more times to
make the call; each time, Brown refused.  According to Smith, McMaster became
increasingly aggravated during this exchange.  McMaster then demanded that
Brown call Ivory Harris, another one of Brown’s cousins.  Brown refused to make
that call as well.  After McMaster repeated his demand and Brown refused a
second time, McMaster glared at Brown.   

After about forty-five
minutes, McMaster, Daniel, Brown, and Kemp left the hotel room together. 
Kentrell Smith and Ricky Smith stayed behind.   By using cell phone company
records showing the time and location of transmission towers used by McMaster’s
cell phone that night, the State established that McMaster left the motel at
about 7:30, then moved in a southwesterly direction, eventually using a cell
tower near Brown’s apartment in Pasadena.  McMaster reached that location about
8:30 and remained there for nearly twenty minutes, then quickly headed
northward along I-45 to the Greenspoint area.  

Also at 8:30, Alex
Ramirez, who lived in an apartment in the same Pasadena complex and directly
across from Brown, was playing cards with some friends when he heard seven or
eight gunshots coming from inside an apartment in or near Brown’s apartment. 
Ramirez assumed that someone was shooting into the air for fun and kept playing
cards. 

Later that evening,
Sergeant King, then a patrolman with the Pasadena Police Department, arrived at
the apartment complex in response to a report of suspicious circumstances at apartment 70.  King found the door to apartment 70 standing wide open.  From the doorway, he
could see a black male, later identified as Brown, unresponsive and lying
face-down on the floor just inside the door.  King called for another officer
and waited for him to arrive before entering the apartment. 

Once inside, the officers
looked for other people in the apartment and found a black female, later
identified as complainant Shelita Jones, also unresponsive, slumped against the
bathroom vanity and bleeding from apparent gunshot wounds to the head.  The
officers confirmed that both individuals were dead and then secured the scene
for the homicide investigators.  Jones was 17 weeks pregnant.

Investigation of the
scene revealed numerous bullet holes and ricochet marks throughout the
apartment, as well as many bullets and spent shell casings, all from
9-millimeter and 10-millimeter rounds.  The officers also found a box of
.38-caliber Winchester rounds in the apartment.  

Autopsies of the
complainants showed that Jones died from two gunshots fired within two feet of
her head.  Stippling on her arm indicated that she had raised it in an attempt
to shield herself from the bullets.  Brown also had two gunshot wounds to the
head, as well as six more gunshot wounds on his lower torso, his legs, and his
left hand.  

Both of the bullets in
Jones’s head were shot from the same firearm and consistent with a .38-caliber
round, as were some of the bullets recovered from Brown’s body.  The remaining
bullets found in Brown’s body and throughout the apartment, however, were from
either 9-millimeter or 10-millimeter rounds.  The variety of bullets at the
scene indicated that the perpetrators of the murders used at least four
different guns—a 9-millimeter, a 10-millimeter, and two different .38-caliber
guns.  

In an interview, Kentrell
Smith told the police about the events leading up to the murders.  Kentrell
Smith also described the guns he saw McMaster and Daniel carrying in the motel
before the murders.  

DNA samples taken from
the scene found McMaster’s DNA on the outside knob to the door of the bathroom
where detectives found Jones’s body.  The police also obtained DNA testing of
several burnt marihuana cigar butts found in the apartment.  Testing of most of
the marihuana cigars did not pinpoint a particular person’s DNA, though neither
McMaster nor Daniel could be excluded as contributors.  

The investigation
culminated in McMaster’s arrest.  Following his trial and conviction, McMaster
pursues this appeal.  

Discussion

Review
of Evidentiary Rulings 

In his first issue,
McMaster contends that the trial court abused its discretion in overruling his
objection to the State’s hypothetical question to its DNA expert concerning the
presence of McMaster’s DNA on the outer doorknob of the bathroom in the
complainants’ apartment. We review a trial court’s evidentiary rulings under an
abuse-of-discretion standard.  Montgomery v. State, 810 S.W.2d 372, 379
(Tex. Crim. App. 1990); Roberts v. State, 29 S.W.3d 596, 600 (Tex. App.—Houston [1st Dist.] 2000, pet. ref’d).  An abuse of discretion occurs only if the trial
court’s ruling is so clearly wrong as to lie outside that zone within which
reasonable persons might disagree.  Montgomery, 810 S.W.2d at 391; Roberts,
29 S.W.3d at 600.  

The State asked its DNA
expert,

Q.      Hypothetically
Shelita Jones is hiding in the bathroom with the bathroom door closed and she’s
standing up by the door, trying to hold it closed.  And Jason McMaster’s on the
other side of the door—it’s a hypothetical—having done something to get his
heart rate up, like shooting and killing somebody in the other room, just real
juiced up, and he’s trying to open that door, trying to get in and grinding his
DNA on that doorknob when he finally forces it open . . . .

At that point, defense counsel
objected “to the prosecutor’s prolonged hypothetical question” on the basis
that it had “gone far beyond the bounds of a hypothetical question.”  On
appeal, McMaster complains that, in posing the hypothetical, the State assumed
facts not in evidence and misled the jury into considering those erroneous assumptions
as substantive evidence, adversely influencing its verdict.  

In eliciting expert
testimony, counsel may pose a question that calls on the expert to assume (1) facts
supported by the evidence, (2) facts within the personal knowledge of the
witness, (3) facts assumed from common or judicial knowledge, or (4) facts in
accordance with his theory of the case.  See Pyles v. State, 755 S.W.2d
98, 118 (Tex. Crim. App. 1988); Barefoot v. State, 596 S.W.2d 875, 887–88
(Tex. Crim. App. 1980), cert. denied, 453 U.S. 913, 101 S. Ct. 3146 (1981).  Counsel may not, however, posit a question based on facts not in
evidence.  Pyles, 755 S.W.2d at 118.

After instructing the
State to get to the point, the trial court overruled the objection.  Heeding
the court’s instruction, the State rephrased its question, asking its expert,




Q.      Would you expect, under that scenario, that
Jason McMaster’s DNA would be the major contributor on that exterior knob to
the bathroom door?

          A.      Yes.  That could account for those
results.

Giving McMaster the
benefit of the doubt concerning whether his objection preserved the issue he
raises on appeal, we nevertheless hold that the trial court did not abuse its
discretion in overruling it, particularly as rephrased.  The investigators
found some of Jones’s hair and blood on the bathroom wall, and Jones was found
dead on the bathroom floor.  These facts indicate that a struggle ensued at the
bathroom door before Jones was shot.  McMaster asserts that the evidence does
not support an inference that he was “juiced up,” but rather, that Daniel was
the only person who took Ecstasy that night.[1] 
The term “juiced up,” however, may not refer to the mental condition of
individuals who have ingested Ecstasy, but could also include intoxication or
even just excitement.  The State’s hypothetical scenario in which McMaster,
having killed Brown, was in an excited state when he approached the bathroom
door to kill Jones, reflects its theory of the case, and comports with
reasonable inferences from the evidence.

Ineffective assistance of counsel
claims

          McMaster next claims that
he was denied his Sixth Amendment right to counsel, contending that his
counsel’s failure to interpose timely and specific objections to (1) the
State’s hypothetical question, should we deem that issue waived, and (2)
extraneous character evidence suggesting the fact McMaster was from New Orleans
made him duplicitous, less sympathetic to human life, and more likely to kill
if he perceived a lack of respect.  Because we affirm the trial court’s ruling concerning
the State’s hypothetical question on its merits, we necessarily reject
McMaster’s claim that his counsel’s failure to preserve his objection to the
State’s hypothetical question deprived him of his Sixth Amendment rights.  See
U.S. Const. amend. VI.  We
consider McMaster’s second complaint of ineffective assistance under the
analysis prescribed by the Supreme Court in  Strickland v. Washington.  466
 U.S. 668, 687–90, 104 S. Ct. 2052, 2063–64 (1984).

To prevail on
a claim of ineffective assistance of counsel, the defendant must show that (1)
his counsel’s performance was deficient and (2) a reasonable probability exists
that the result of the proceeding would have been different.  Strickland,
466 U.S. at 687, 104 S. Ct. at 2064.  The first prong of Strickland
requires the defendant to show that counsel’s performance fell below an
objective standard of reasonableness.  Thompson v. State, 9 S.W.3d 808,
812 (Tex. Crim. App. 1999). Thus, the defendant must prove objectively, by a
preponderance of the evidence, that his counsel’s representation fell below
professional standards.  Mitchell v. State, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002).  The second prong requires the defendant to show a reasonable
probability that, but for counsel’s unprofessional errors, the result of the
proceeding would have been different.  See Strickland,
466 U.S. at 694, 104 S. Ct. at 2068; see also Thompson, 9 S.W.3d at
812.  “A [reviewing] court [should] indulge a strong presumption that counsel’s
conduct falls within the wide range of reasonable professional assistance; that
is, the defendant must [also] overcome the presumption that, under the
circumstances, the challenged action ‘might be considered sound trial strategy.’”
Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. “Any allegation of ineffectiveness
must be firmly founded in the record, and the record must affirmatively
demonstrate the alleged ineffectiveness.” Thompson, 9 S.W.3d at 813
(citing McFarland v. State, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996)).
 “Under normal circumstances, the record on direct appeal will not be
sufficient to show that counsel’s representation was so deficient and lacking
in tactical or strategic decision making as to overcome the presumption that
counsel’s conduct was reasonable and professional.”  Bone v. State, 77
S.W.3d 828, 833 (Tex. Crim. App. 2002).

          Here, nothing in the record
affirmatively demonstrates that defense counsel rendered ineffective assistance
by failing to object to the opinion of McMaster’s codefendant concerning people
from New Orleans.  Absent such an affirmative showing, we presume, as we must,
that defense counsel, in the exercise of her reasonable professional judgment,
had valid strategic reasons for deciding not to object to the testimony at
issue.  We therefore reject McMaster’s ineffective assistance claim.

Factual sufficiency challenge

          In his final issue,
McMasters contends that the evidence is factually insufficient to support his
capital murder conviction.  In evaluating factual sufficiency, we consider all
the evidence in a neutral light to determine whether the jury was rationally
justified in finding guilt beyond a reasonable doubt.  Watson v. State,
204 S.W.3d 404, 414 (Tex. Crim. App. 2006).  We will set the verdict aside only
if (1) the evidence is so weak that the verdict is clearly wrong and manifestly
unjust or (2) the verdict is against the great weight and preponderance of the
evidence.  Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). 
Under the first prong of Johnson, we cannot conclude that a verdict is
“clearly wrong” or “manifestly unjust” simply because, on the quantum of
evidence admitted, we would have voted to acquit had we been on the jury.  Watson,
204 S.W.3d at 417.  Under the second prong of Johnson, we cannot declare
that a conflict in the evidence justifies a new trial simply because we
disagree with the jury’s resolution of that conflict.  Id. 
Before finding that evidence is factually insufficient to support a verdict
under the second prong of Johnson, we must be able to say, with some
objective basis in the record, that the great weight and preponderance of the
evidence contradicts the jury’s verdict.  Id.  We must
also discuss the evidence that, according to the appellant, most undermines the
jury’s verdict.  See Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003). 

          The fact-finder alone
determines the weight to place on contradictory testimonial evidence because
that determination depends on the fact-finder’s evaluation of credibility and
demeanor.  Cain v. State, 958 S.W.2d 404, 408–09 (Tex. Crim. App.
1997).  As the determiner of the credibility of the witnesses, the fact-finder
may choose to believe all, some, or none of the testimony presented.  Id. at 407 n.5.  As an appellate court, we must avoid re-weighing the evidence and
substituting our judgment for that of the fact-finder. Johnson v. State,
967 S.W.2d 410, 412 (Tex. Crim. App. 1998); see also King v. State, 29
S.W.3d 556, 562 (Tex. Crim. App. 2000); Wilson v. State, 863 S.W.2d 59,
65 (Tex. Crim. App. 1993).

          The trial court instructed
the jurors that to find McMasters guilty of capital murder, they must find that
the evidence shows beyond a reasonable doubt that McMasters intentionally or
knowingly caused the deaths of Jones and Brown in the same criminal transaction
by shooting them with a firearm. See Tex.
Penal Code Ann. § 19.03(a)(7) (Vernon 2005).  Alternatively, the trial
court instructed, the jurors could find McMasters guilty of capital murder
under the law of parties if they believed that McMasters intended to promote or
assist in the offense and solicited, encouraged, aided, directed, or attempted
to aid another person in the commission of the offense.  Tex. Penal Code Ann. § 7.02(a)(2)
(Vernon 2005).  

          McMaster takes issue with
the factual sufficiency of the evidence that (1) Detective Powell testified
that he found McMaster’s DNA in the apartment on the exterior doorknob of the
bathroom and on a cigar butt, because no evidence indicates when it was placed
there, and thus nothing places him in the apartment at the time of the murders;
(2) McMaster’s cell phone records place him with or near Brown after leaving
the motel, and then indicate that he moved in a northerly direction to the 1960
area, but standing alone, prove no more than McMaster’s physical proximity to
the complainants after he left the motel; (3) Kentrell Smith testified that he
had never been to the complainants’ apartment, which indicates that, despite
his family connection with Brown, he was unfamiliar with the complainants’ lives. 


          McMaster
implies—incorrectly—that because neither the DNA evidence nor the cell phone
records independently amount to factually sufficient evidence to support the
jury’s verdict, the evidence is not factually sufficient to support his
conviction.  Factual sufficiency does not require that each fact point directly
and independently to the defendant’s guilt; rather, the verdict will withstand
a factual sufficiency challenge as long as the combined and cumulative force of
all the circumstances permits the conclusion that the jury was rationally
justified in finding the defendant guilty of each element of the crime beyond a
reasonable doubt. Johnson v. State, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993).  Here, the DNA evidence, coupled with the cell phone records,
provides factually sufficient support for a jury to reasonably infer that
McMaster was in Brown’s apartment at the time of the murders, and that McMaster
used his own rare, 10-millimeter handgun as the murder weapon.  See Earls v.
State, 707 S.W.2d 82, 85 (Tex. Crim. App.1986) (holding circumstantial
evidence sufficient for jury to infer defendant was perpetrator).  Finally, we
reject McMaster’s complaints about flaws and inconsistencies in Kentrell
Smith’s testimony because they involve his credibility and the weight to be
given to his testimony, issues entrusted to the fact-finder alone.  See Cain,
958 S.W.2d at 408–09.  Consequently, we hold that the evidence is factually
sufficient to support McMaster’s capital murder conviction.

Conclusion

We hold that the trial
did not abuse its discretion in overruling defense counsel’s objection to the
State’s hypothetical question to its expert, and counsel’s representation of
McMaster in the trial court complied with constitutional safeguards.  We
further hold that the evidence is factually sufficient to support the jury’s
finding that McMaster is guilty of capital murder.  We therefore affirm the
judgment of the trial court.

 

                                                          

Jane Bland

                                                Justice

 

Panel consists of Judges Jennings,
Hanks, and Bland.

Do not publish.  Tex. R. App. P. 47.2(b).

 

 

 









[1]
McMaster also suggests that the State’s
hypothetical is flawed because the inner bathroom door handle did not contain
Jones’s fingerprints, and because, while the evidence supported a finding that
McMaster had a 10-millimeter pistol that evening, none of the shell casings
found at the apartment bore his fingerprints or DNA.  The lack of proof of
these specific points, however, does not require the conclusion that Jones did
not resist her assailant’s entry into the bathroom by some other means, such as
by throwing her weight against the door, or that the 10‑millimeter shell
casings found in the apartment could not have come from McMaster’s gun.