NO. 07-01-0342-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL C



MARCH 20, 2002



______________________________




BRITE TRUCKING CO., INC., APPELLANT



V.



ELDON MARTIN D/B/A MARTIN CONSTRUCTION, APPELLEE




_________________________________



FROM THE 72ND DISTRICT COURT OF LUBBOCK COUNTY;



NO. 2000-509,664; HONORABLE WELDON KIRK, JUDGE



_______________________________



Before QUINN and REAVIS and JOHNSON, JJ.

 On August 16, 2001, a copy of a Notice of Appeal from a Judgment in Cause No.
200-509,664 in the 72nd District Court of Lubbock County, Texas, was filed with the clerk
of this court. The Judgment was signed on May 30, 2001. 

 On November 19, 2001, the trial court clerk's record was filed with the clerk of this
court. On November 20, 2001, the reporter's record was filed with the clerk of this court.

 By letter dated February 5, 2002, counsel for appellant was advised that neither
appellant's brief nor a motion to extend time for filing the brief had been filed and that
unless a response reasonably explaining the failure to file the brief and a showing that
appellee had not been significantly injured by such failure was received by February 18,
2002, the appeal would be subject to dismissal. No response has been received to the
letter of February 18, 2002. Neither appellant's brief nor a motion to extend time for filing
the brief have been filed. 

 This appeal is dismissed. Tex. R. App. P. 38.8(a)(1). Costs are taxed to appellant. 
Tex. R. App. P. 43.4.


 Per Curiam

Do not publish.


 



Oak Cliff.


 On the evening of October 3, 1992, Claudia went to the Oak Cliff residence where she
visited with her sons and her mother. Kasandra Thomas, the estranged wife of Keenon Thomas,
was also present at the home. During the course of the evening, Kasandra and Keenon got into
an argument about a "beeper" which Kasandra believed Keenon had hidden from her. That
evening, Claudia saw Keenon count out approximately eleven hundred dollars he had received
from her husband, Alfonso Williams, in order to make some car repairs and pay off a motorbike.


 At approximately 12:30 a.m. on the morning of October 4, Claudia, Alfonso, and
Kasandra left the Oak Cliff residence. Around 1:30 a.m., Keenon called Claudia's home and
talked to his sister, telling her he had found Kasandra's beeper. The grandmother also got on the
telephone and told Claudia the beeper was "constantly going off." While she was on the phone,
another call came in on the other line. Keenon got back on the phone and told Claudia he would
call her back later. He never did. Claudia spoke with Kasandra on the telephone about 2:00 a.m.
and notified her that the beeper had been located.


 Later that day, between 12:30 and 1:00 p.m., Claudia, accompanied by her daughter
Tameeka, her husband Alfonso, a grandbaby, and Kasandra, returned to her mother's house in
Oak Cliff. As they drove up to the house, Claudia noticed Roderick's hat lying in the yard. 
When she walked into the kitchen of the house, she found the bodies of her mother and her two
sons, as well as the body of a man named Charles "Junior" Wilson, on the floor. They had been
shot to death. The police were notified and commenced their investigation. Neither the $1,100
nor Keenon's billfold was located.


 On cross-examination, Claudia testified she was uncertain as to whether she called
Kasandra or if Kasandra called her after she had returned to her home in the early morning of
October 4. Claudia also testified Kasandra left the grandmother's house about 12:00 a.m.,
apparently to pick up her aunt in Fair Park. However, before the group returned to the Thomas
house later that day, they picked up Kasandra at her grandmother's house, also in Oak Cliff,
where Kasandra said she had spent the night.


 Claudia stated she had never seen any drug dealing going on at her mother's house but
admitted that her son Roderick was on drugs and would sell soap to people who thought it was
cocaine. She also testified that Kasandra and Keenon had a troubled relationship and that
Kasandra had called the police on two or three occasions because of problems between them. She
also said that, on occasion, the grandmother had called the police to get Roderick out of her
house.


 Kasandra Thomas testified that when she met Keenon in the summer of 1991, he was
dealing drugs. They married in June 1992 but were separated at the time of his death in October. 
Kasandra testified, however, that they were attempting a reconciliation and were anticipating
getting an apartment with his mother. On October 3, Kasandra cashed an AFDC check and gave
Keenon $200. Later that day, when she picked up Keenon, he was "real upset" because his
brother, Roderick, had gotten in an argument with someone and they "all could have been dead"
because Kasandra had been late getting there.


 Kasandra took Keenon to his grandmother's house to get some money with which to buy
some drugs. About 11:30 p.m. that night, she took Keenon to an apartment complex to buy the
drugs. After purchasing the drugs, they returned to Keenon's grandmother's house, at which time
they got into an argument about her missing "beeper." After she unsuccessfully tried to get her
$200 back, Kasandra left the house, went to Fair Park to pick up two of Keenon's aunts, and took
the aunts to Keenon's grandmother's house.


 Kasandra testified that after delivering the two women, she sat in front of the house and
talked to some of her friends who were there. A little after 1:00 a.m., she stated that she went
to visit her friend Juanita Jones, from whose apartment she called Claudia Williams and had the
conversation where she learned that her "beeper" had been located. She spent the night at
Juanita's and returned with the other family members to the grandmother's house about 7:00 a.m.
to discover the bodies of the victims.


 Kasandra testified that she had met appellant at a south Dallas club prior to the murders
and that she knew he was a drug dealer. She had previously seen appellant and the deceased
brothers together on a street known as "the cut," which was frequented by a number of drug
dealers. Kasandra said that about 8:30 or 9:00 p.m. on October 3, she saw appellant at a car
wash, sitting on top of his car talking to a friend called "D." At that time, appellant told her he
was about to go to a party. On the following morning, prior to her return to the grandmother's
house, she called appellant and briefly visited him at his apartment. At that time, she said, he
seemed normal.


 Sometime between 8:00 and 9:00 p.m. on the day the murders were discovered, appellant
telephoned Kasandra and said he needed to talk to her. They met in the parking lot at Juanita's
apartment later that evening. At that time, Kasandra told appellant and Juanita she "knew
Roderick had gotten into it" with someone and she was afraid that person would try to kill the rest
of them. Appellant responded, "I didn't have to worry; that the people they was after, they got,
and they wasn't after anyone else." He also told her he was the one "that had done it" and that
he "took care of his business." Appellant related to her that he and "D" drove his car to an area
near the grandmother's house and then walked over to the house. The pair encountered Roderick
and Charles Wilson in the front yard of the house. Appellant told Roderick to go inside and tell
Keenon to give him his "stuff" or "shit."


 Roderick went into the house but returned to the front yard without the items. Appellant
then told his companion to "watch those suckers" (Roderick and Wilson) and went into the house. 
He explained that when he grabbed Keenon inside the house, the grandmother started to run so
he fired a warning shot to stop her. She ran into the kitchen, went under a table and said, "Oh,
my God, I'm fixing to die." With the rejoinder, "You're right, bitch," appellant shot Keenon in
the back of the head and also shot the grandmother.


 Appellant called outside to his companion to bring Roderick and Wilson into the house. 
Roderick refused to lie on the floor so appellant shot him in the head. Appellant then told his
companion to "shoot the nigger," referring to Wilson. His companion shot Wilson in the arm and
the leg but appellant, with the comment, "[T]hat's not the way to kill a nigger," took "D"'s gun
and shot Wilson. The two left the house after the shooting, but appellant returned and again shot
all the victims to make sure they were dead. Appellant also told Kasandra he gave someone
named Robert the guns that were used in the killings.


 Initially, Kasandra did not believe appellant until he threw Keenon's billfold on the
ground. At that point, she became very upset. Appellant then said that he only told Kasandra so
she would not "be running around thinking someone was after [her], and if [she] was going to be
acting all delirious and crazy then -- no, he said, 'Don't tell me I'm going to have to watch you,
too' or something like that." With the remark that murder was the easiest crime to commit,
appellant left her. Kasandra testified that she only saw appellant on one occasion after this
conversation and that he inquired if she was going to turn him in. She did not give the police any
information until after appellant had been arrested because she was afraid.


 Juanita Jones testified that Kasandra was her friend and would confide in her. She related
that pursuant to this confidence, Kasandra had told her that she and appellant were lovers. 
Kasandra visited Juanita on the evening of October 3 around 6:30 p.m. and reported that she and
Keenon had been arguing. While at Juanita's apartment, Kasandra was "beeped." She then left
Juanita's apartment, stating that she was going to see appellant. Later that night, about 2:00 or
3:00 a.m., Kasandra came to Juanita's apartment and told Juanita that she needed an alibi because
appellant had killed Keenon.


 Juanita averred that Kasandra said that she believed appellant had killed Keenon because
he had shown her Keenon's billfold and had given her $200 out of it. Kasandra also said that she
had told appellant about her difficulties with Keenon and appellant had told her "I'll take care of
it." Juanita then went downstairs with Kasandra and the two of them talked with appellant in the
parking lot. During the conversation, appellant essentially corroborated Kasandra's testimony
about the details of the murders. However, appellant also told them he had looked for money in
the house and had used a wet towel to wipe off fingerprints. Although Kasandra was very upset
during appellant's recitation, appellant appeared quite calm. Although Juanita told Kasandra she
would give her an alibi, she contacted the police some two to three weeks later.


 Under cross-examination, Juanita testified that Kasandra had admitted dealing drugs in the
past but that she did not indicate that she was involved in the killings. Kasandra's stated reason
for wanting an alibi was because she had been at appellant's apartment during the time of the
killings. Upon re-direct, Juanita testified that appellant told her he had taken the guns used to
commit the murders to his cousin's house.


 Gary O'Pry, a physical evidence officer with the City of Dallas Police Department,
testified he was called to the scene of the murders about 1:40 p.m. on October 4, 1992. In the
course of his investigation at the scene, he did not find appellant's fingerprints. Although he did
not find any weapons at the scene, O'Pry did find six .45 caliber casings, four .45 caliber bullets,
five .9 mm casings, one .9 mm bullet and one bullet that was so badly deformed that he could not
tell its caliber. Recalled at a later time in the trial, the officer testified that the kitchen table and
counter top appeared to have been wiped clean of fingerprints.


 Dr. Joni McLain, a medical examiner with Dallas County, performed autopsies on the
victims. In sum, her direct testimony was that gunshot wounds were the cause of death of the
victims. Under cross-examination, she testified that the drug screens on Keenon and the
grandmother were negative, while the drug screens on Roderick Thomas and Charles Wilson
indicated the presence of cocaine in the blood.


 Lannie G. Emanuel, a firearm and toolmarks examiner with the Southwestern Institute of
Forensic Sciences, testified that the .45 caliber shell casings found at the scene were all fired from
the same weapon and that the .9 mm casings were also fired from the same weapon.


 Robert Caruthers, appellant's cousin, testified on direct examination that he had a
conversation with appellant on October 4 when appellant brought him a VCR to be repaired. In
the course of the conversation, appellant tried to tell Caruthers something but Caruthers stopped
him because he did not want to know. Under cross-examination by appellant's counsel, Caruthers
said the police threatened to give him six years for withholding evidence and denied that appellant
ever told him, or tried to tell him, anything about the murders. He denied receiving the murder
weapons from appellant.


 Julia Tafalla, a detective with the City of Dallas Police Department, testified she was called
to the murder scene about 2:00 p.m. on October 4. At that time, she unsuccessfully attempted
to interview persons in the neighborhood. The next day, an anonymous male caller said that a
man named "Gussy" had killed the four people because he and Roderick's wife were having an
affair. In the days following the murders, the police received numerous anonymous telephone
calls with unverifiable information. However, on October 22, 1992, Juanita Jones came forward
with the information that appellant had told her and Kasandra the details of the murders. Tafalla
testified that in the course of their conversation, Juanita indicated to her that appellant gave the
guns used in the murders to his cousin, Robert Caruthers. Tafalla contacted Caruthers who told
her that appellant had come to his house and told him that he had committed four murders. 
Caruthers explained that he had stopped appellant at that point because he did not want to hear any
more. Some time later, Kasandra gave the police a statement in which she said appellant had
confessed to her that he committed the murders and then proceeded to give her the details.


 Under cross-examination, Tafalla stated there were numerous suspects investigated who
may have had motives to commit the murders. She testified that Caruthers denied having any
information about the weapons. Tafalla denied threatening to put Caruthers in jail for six years.


 Kasandra Thomas was recalled for the purpose of cross-examination. In the course of that
examination, she recanted portions of her previous testimony. On the night of the murders, after
she had delivered the aunts to the grandmother's home, Kasandra drove to appellant's apartment
and let herself in with her own key. She went to sleep on the couch and woke up when appellant
came through the door at approximately 5:30 a.m. that morning. He told her that he and a
companion had been at a party in Grand Prairie. Kasandra then went to the house where Claudia
Williams picked her up an hour or so later and they went to the grandmother's house, where they
discovered the bodies. Later that day, Kasandra went to her grandmother's house. That evening,
appellant called and told Kasandra he needed to speak to her. She told him to meet her at Juanita
Jones's apartment. It was there that appellant told Juanita and her that he had committed the
murders. Kasandra said she had lied to the jury previously about spending the night at Juanita
Jones's apartment because she was concerned about being at appellant's apartment at the time of
the murders. On the advice of her attorneys, Kasandra wrote love letters to appellant in jail
because she "didn't know who his people were or who his friends was, and they could have did
anything to [her]."


 On redirect examination by the State, Kasandra testified she initially lied about not having
a sexual relationship with appellant because she did not think anyone would believe that she had
nothing to do with the murders. She did not go to the police after learning that appellant had
committed the murders because she was afraid he would also kill her.


 Michael Perkins, a friend of Roderick Thomas, testified that he lived a little less than a
block away from the scene of the murders. On the night of the murders, sometime between 2:30
and 3:00 a.m., he heard a number of gunshots in rapid succession. Some of the gunshots sounded
like an automatic was used and some sounded as if a larger caliber weapon was used. He said he
would hear gunshots in that neighborhood two or three times a week.


 Phillip C. Mangum testified that on the night in question, he was working in the area
dispatching buses for the Dallas County schools. At approximately 7:30 p.m., he heard one of
the victims arguing with someone in a gray Mustang. The argument ended when the driver of the
Mustang drove off at a high rate of speed. Later that night, after midnight, he heard five or six
gunshots punctuated by pauses.


 David Walker testified he grew up with Keenon Thomas and was aware that he was
dealing drugs. On the night of October 3 at approximately 11:30 p.m. or midnight, he saw a car
chasing Roderick Thomas. Roderick escaped by running under a fence.


 Arturo Thompson, John Phillip Allen and Oscar Cole testified that they were acquainted
with appellant and did not believe him to be a violent person. Joyce Tregg, appellant's aunt,
testified that Kasandra visited her frequently after appellant was jailed and also kept in touch with
appellant at the jail. According to Tregg, appellant's girlfriend was Renee Jones. Tregg also
testified that she once heard Kasandra tell Renee that if she, Kasandra, could not have appellant,
Renee could not have him either.


 Jeff Gardner, a private investigator appointed by the trial judge on appellant's behalf,
testified that on December 24, 1992, he interviewed Kasandra about the murders. Kasandra told
him that she knew the murders were going to happen before they occurred. She also told Gardner
that she was asleep at appellant's apartment when the murders were committed and that appellant
told her about the murders around 6:00 a.m. that morning. No one else heard appellant tell her
about the murders. Gardner said Kasandra pinpointed the time of the murders as between 1:30
and 2:00 a.m. Gardner also interviewed a number of other witnesses. In response to his query,
the witnesses told Gardner that appellant was with Vincent Buford and Lola Renee Jones at the
time of the murders.


 Vincent Buford testified that in October 1992, he was separated from his wife and stayed
with appellant on a Saturday night in either the first or second week of that month. He and
appellant sat outside appellant's apartment talking until approximately midnight or 12:30 a.m. 
Buford then went inside and went to sleep on a couch. At approximately 2:30 or 3:00 a.m.,
Buford saw Renee Jones enter the apartment and go into appellant's bedroom. He testified that
appellant's automobile was not running at the time.


 Lola Renee Jones averred that appellant was her fiance and that she slept with appellant
at his apartment most weekends. On the night in question, she was at a club with a friend, Janet
Heywood. Jones beeped appellant twice on his pager that night and appellant returned her calls
both times. She stayed at the club until approximately 2:15 to 2:30 a.m. and then Heywood drove
her to appellant's apartment, where she saw Vincent Buford sleeping on the couch. She said that
one of appellant's Cadillacs was in the shop on the night of the murder and the other one was
broken down. She also stated that Kasandra had called her once and reported that she, Kasandra,
was having an affair with appellant.


 Janet Heywood swore that she was with Renee at the club on the night of the murders. 
She testified that she dropped Renee off at appellant's apartment at approximately 2:30 or 2:45
a.m. and saw appellant open the door for Renee. She returned to appellant's apartment between
1:30 and 2:00 p.m. the next afternoon. Appellant left the apartment to go to his cousin's
residence to get a VCR fixed. He did not leave with any guns.


 Appellant took the stand and denied that he had any part in the murders. He stated that
Renee Jones was his girlfriend but admitted he had an occasional sexual relationship with
Kasandra. Appellant testified that he was at home on the night the murders occurred and at
approximately 8:00 p.m., was visited by Vincent Buford. Buford explained that he had a fight
with his wife and asked if he could stay with appellant that night. They talked outside the
apartment complex until Buford went inside around midnight. Appellant stayed outside and talked
to a man named Vato until sometime between midnight and 1:00 a.m., when he went inside. 
Renee had paged appellant between 10:00 and 10:30 p.m. and told him she was going out to a
club with a girlfriend.


 Renee came by appellant's apartment about 2:30 a.m. and stayed the rest of the night. 
Appellant said Buford left his apartment between 8:00 and 9:00 a.m. that morning. Janet
Heywood arrived at his apartment about 1:45 p.m. Appellant then left the apartment and took his
VCR to his cousin to be repaired. He returned to the apartment about 4:00 p.m. and he and
Renee went out to dinner. They were together for the rest of the evening. He denied seeing
Kasandra either day and denied that he ever confessed to Kasandra or Juanita Jones that he
committed the murders. He also said one of his Cadillacs was broken down and the other one was
in the shop.


 In mounting his first point attack, appellant makes four basic contentions. First, he attacks
the credibility of the State's witnesses, particularly that of Kasandra Thomas and Juanita Jones. 
Second, he asserts his defensive theory was alibi and that the State did not disprove that theory. 
Third, there was testimony that numerous other individuals had the means and motive to commit
the offense. His fourth and last challenge is that no fingerprint evidence or confessions were
offered by the State. Thus, he concludes, the evidence is insufficient to sustain the convictions.


 It is now axiomatic that the appellate test for determining the sufficiency of the evidence
to support a conviction is not whether the reviewing court believes the evidence establishes guilt
beyond a reasonable doubt, Stoker v. State, 788 S.W.2d 1, 6 (Tex.Crim.App. 1989), cert. denied,
498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990); rather, the applicable standard of review
is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational
trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 
Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).


 In support of his point, appellant cites Wilson v. State, 863 S.W.2d 59, 65 (Tex.Crim.App.
1993) and argues that the State's evidence was not sufficient to exclude every reasonable
hypothesis other than the guilt of the appellant and, because of that failure, reversal is mandated. 
Appellant's reliance upon Wilson, however, is misplaced. As that court noted in its sixth
footnote, the cause on appeal was tried before the "exclusion of every other reasonable
hypothesis" analytical construct was rejected by the Texas Court of Criminal Appeals in Geesa
v. State, 820 S.W.2d 154, 157-61 (Tex.Crim.App. 1991). In Geesa, the court abandoned that
construct as to cases which were tried subsequent to the release of that opinion. Hence, in cases
such as this one which are tried subsequent to Geesa, the test to be applied is the same in both
direct and circumstantial evidence cases.


 In applying the Jackson test and reviewing all the evidence as we must, our focus is not
upon what the State failed to show; rather, it must be on the evidence actually introduced. 
Chambers v. State, 711 S.W.2d 240, 245 (Tex.Crim.App. 1986). Additionally, as a reviewing
court, we may not resolve any conflict of fact, weigh the evidence or assign credibility to the
witnesses for those functions are exclusively within the province of the jury as the fact finder. 
Juarez v. State, 796 S.W.2d 523, 524 (Tex.App.--San Antonio 1990, pet. ref'd).


 If accepted by the jury, the State's testimony is sufficient to establish the elements of the
charged offenses. The jury also acted within its province of arbiter in rejecting appellant's
defensive testimony of alibi. Thus, viewed in the light in which we must view it, the evidence,
which we have set out in some detail, is sufficient to support the jury's verdict. Appellant's first
point is overruled.


 The thrust of appellant's second point challenge is that the trial court committed reversible
error when it commented on the credibility of Robert Caruthers after the witness testified that
appellant did not relate anything to him about the murders. To intelligently discuss that question,
even though it will lengthen this opinion, we must set out the colloquy giving rise to the challenge
in full. It is as follows:


 On direct examination by the State, Caruthers testified:


 Q: Did -- are you denying that you told the detectives also on that date that Gus
Mays had started to tell you all about the murder, but you stopped him, because
you didn't want to know the details?


 A: Well, he did on -- he did.


 Q: He did what?


 A: Well, he tried to.


 Q: He --


 A: He tried to tell me something about it, you know, but I didn't want to know --


 Q: He tried to tell you --


 A: -- whatever it was.


 Q: -- but that's --


 A: Excuse me.


 Q: Go ahead. Tell me exactly what he said.


 A: Who, Gus?


 Q: Yes.


 A: You know, he tried to explain something to me, you know, about it, whatever it was.


 Q: About the murders?


 A. Yeah, uh-huh.


 Under cross-examination by defense counsel the following occurred:


 Q: Isn't it true that you told us that Gus Mays came over and went about his
business, and there was no discussion whatsoever -- any indication that he was 

 --


 A: No. 


 Q: -- guilty of anything?


 A: No discussion at all.


 Q: Is that correct?


 A: Uh-huh, that's true.


 . . . .


 Q: Okay. And you -- you didn't tell us anything about this man being guilty or
talking about any killings?


 A: Huh-uh, no.


 Q: Okay. Is it true that he did not say anything about these killings?


 A: He never, no, said a word about it.


 Q: Did he do anything to indicate that he -- at that time, that he knew anything or
did anything?


 A: No, huh-uh.


 . . . .


 Q: And you agree that there was nothing -- we talked to you for two hours, and
you said nothing like you're now saying?


 A: Uh-huh, that's true. Uh-huh.


 On re-cross examination, defense counsel continued:


 Q: Did you ever discuss these killings in any way with any of these people?

 

 A: Huh-uh, no.


 Q: You did not?


 A: No.


 Q: Did you understand the question the prosecutor asked you?


 A: No, huh-uh.


 Q: You did not?


 A: Huh-uh, no.


 Q: Let me go back again. She says that he started to say something about the
killings.


 A: Uh-huh. 


 . . . .


 Q: If Gus Mays said anything to you about the killings --

 A: Uh-huh.


 Q: -- I'd like to know what words was -- exactly what words he said.


 A: Well, he never said anything about it. Huh-uh, he never -- he never said a
word about it.


 It was immediately after this last answer that the dialogue giving rise to appellant's
challenge occurred. It is as follows:


 THE COURT: Well, how do you start to say something and how did you know
what he was talking about if he didn't say anything?


 THE WITNESS: Well, he never said anything to me about it, you know.


 THE COURT: You said he started to say something about the killings, and you
didn't want to hear it.


 THE WITNESS: Uh--huh, yeah.


 THE COURT: How do you start to say something? How did you know what it
was?


 THE WITNESS: Well, I wouldn't know, you know. I didn't want to know
anything about whatever it was.


 THE COURT: What did he say that he started to say?


 THE WITNESS: Well, he didn't say anything, you know.


 THE COURT: Well, that doesn't make sense.


 THE WITNESS: Well, I know it. I know --

 

 MR. HEINRICHS [Defense Counsel]: Judge, we -- we'll object to --


 THE WITNESS: He didn't say anything.


 MR. HEINRICHS: -- the Court's comment on the -- on the evidence.


 THE COURT: I overrule your objection. The Jury has a right to know what he's
talking about.


 THE WITNESS: Well, I don't know what he's talking about, either.

 

 THE COURT: To know what you're talking about.


 THE WITNESS: Well --

 

 THE COURT: Is that the only thing you want to tell us?


 THE WITNESS: That's all I know.


 The thrust of appellant's contention is that the statement, "The jury had a right to know
what he's talking about," made by the trial judge when he overruled defense counsel's objection,
constituted a comment on the weight of the evidence because it "conveyed to the jury the fact that
the trial court did not believe that the Appellant did not tell Caruthers about the killings."


 Initially, the State argues appellant did not preserve this question for appellate review
because the question raised on appeal differs from the trial objection. The State's argument is that
the objection during trial, i.e., that the judge commented on the weight of the evidence, differs
from the appellate contention, i.e., that the judge conveyed his disbelief of the witness's
testimony. We disagree. The trial objection, in its context, was sufficient to convey to the trial
judge the sense of appellant's contention that the judge's remark was an inappropriate comment
on the weight to be given the testimony of the witness.


 However, we cannot agree that reversal is required. To require reversal, a trial court's
comment must be such that it is reasonably calculated to benefit the State or to prejudice the rights
of the defendant. Becknell v. State, 720 S.W.2d 526, 531 (Tex.Crim.App. 1986), cert. denied,
481 U.S. 1065, 107 S.Ct. 2455, 95 L.Ed.2d 865 (1987). In this case, the trial judge's remark
was directed to the witness's vacillating testimony and was in the nature of an attempt to clarify
that testimony. Bearing in mind that the witness was placed on the stand by the State, the judge's
remark did not indicate what portions of the witness's testimony he believed or disbelieved;
rather, his comment was simply addressed to the confusing nature of the witness's answer. Nor
was the remark sufficient to show any favoritism towards the State or express any opinion as to
what portions of the witness's testimony should be accepted or rejected by the jury. See
Brokenberry v. State, 853 S.W.2d 145, 152 (Tex.App.--Houston [14th Dist.] 1993, pet. ref'd.)
(trial judge's remark that he was confused by witness's apparently contradictory statements did
not require reversal). Appellant's second point is overruled.


 In his third point, appellant avers the trial court erred in refusing to receive certain
testimony from Derrick Money which was tendered by the defense. The essence of that testimony
is as follows:


 Like I had told Gus Mays, I had heard -- one day back in December when I was
in the jail, there was just a conversation going on about this case, and the
conversation was about that four people had got killed on Ann Arbor or
somewhere in that location by Zumwalt Middle School, and they said it was two
brothers, and one had a dope addiction and he had -- he was -- he had a problem
of always getting drugs from someone and messing somebody over.


 So, these Jamaicans had gave him some dope; I guess he was supposed to have
selling or something. And on the way from the store where he was going, the
Jamaicans chased him back to his house where his brother and them was staying,
and his brother was supposed to have been a dope dealer. And when they got
there, I guess they killed everybody in the house.


Subsequent to the above excerpt, the witness said he could not recall the name of the person with
whom he had the conversation.


 In support of this point, appellant recognizes the tendered testimony is hearsay, but
contends it is admissible under the "statement against interest" exception to the hearsay rule. 
That exception is as follows:


 Statement Against Interest. A statement which was at the time of its making so
far contrary to the declarant's pecuniary or proprietary interest, or so far tended
to subject him to civil or criminal liability, or to render invalid a claim by him
against another, or to make him an object of hatred, ridicule, or disgrace, that a
reasonable man in his position would not have made the statement unless he
believed it to be true. A statement tending to expose the declarant to criminal
liability is not admissible unless corroborating circumstances clearly indicate the
trustworthiness of the statement.


Tex. R. Crim. Evid. 803(24). In his attenuated argument, appellant reasons that the reliability
of the excluded statement was shown by the record as the defense had established an alibi and the
statements that were offered were in the nature of a statement against interest.


 The testimony was clearly inadmissible. The fact that the witness overheard some
unidentified person making the statements is not sufficient to show any requisite exposure, on the
part of any person, to civil or criminal liability or any of the detrimental effects described in the
rule. Neither does the fact that appellant relied upon an alibi defense add anything to the
credibility of the proffered testimony. Indeed, the witness merely concluded with his "guess" that
"they" killed everyone in the house. Appellant's third point is overruled.


 In his fourth point, appellant contends the trial court reversibly erred in receiving
testimony from Kasandra that she had received a death threat from an unidentified male over the
telephone the night before her concluding testimony. Appellant's contention is that the testimony
was not relevant and the prejudicial effect of the testimony exceeded its probative value. He also
argues the State failed to establish that the calls were made by appellant or at his direction.


 Appellant's trial objection to this testimony was that it was "irrelevant" and that it
concerned an extraneous offense. Rule 401 of the Texas Rules of Criminal Evidence defines
"relevant" evidence as "evidence having any tendency to make the existence of any fact that is of
consequence to the determination of the action more probable or less probable than it would be
without the evidence." Rule 403 of the Rules provides, in pertinent part, that relevant evidence
may be excluded if its probative value is substantially outweighed by the danger of unfair
prejudice. Rule 404(b), in its pertinent part, provides that evidence of other crimes, wrongs, or
acts is not admissible to prove the character of a person in order to show he acted in conformity
therewith.


 In considering appellant's argument, we first note that an objection that the proffered
evidence amounts to proof of an extraneous offense will not suffice, in and of itself, to preserve
the question of whether the evidence, if relevant, is subject to exclusion because its prejudicial
effect exceeds its probative value. To preserve that question, a specific objection invoking Rule
403 must be made. See Montgomery v. State, 810 S.W.2d 372, 388 (Tex.Crim.App. 1991)
(opinion on motion for rehearing). Accordingly, our discussion will be limited to the
determination of whether the testimony was relevant and, if so, whether it has relevance apart
from an inference of character conformity.


 Under the broad definition of relevance in the present rules, evidence of the type in
question may be admissible if it tends to rebut a defensive theory. Id. Evidence is relevant if it
influences facts that concern the ultimate determination of guilt. Lockhart v. State, 847 S.W.2d
568, 574 (Tex.Crim.App. 1992), cert. denied, ___ U.S. ___, 114 S.Ct. 146, 126 L.Ed.2d 108
(1993). To constitute an extraneous offense offered against a defendant, the evidence must show
a crime or a bad act and be connected to him. Id. Only by inference could the calls be connected
to appellant.


 However, during the course of the trial, the defense had attempted to defuse the effect of
Kasandra's testimony by showing she was motivated to testify against appellant because she was
in love with him and was jealous of his relationship with Renee. In response, Kasandra said that
she kept her connection with appellant after he confessed committing the murders because of her
fear of him or those who were associated with him. That being true, the testimony was relevant
to aid the jury in assessing the motive and reliability of Kasandra's testimony linking appellant
with the crime and, as such, it had relevance aside from an inference of character conformity. 
Appellant's fourth point is overruled.


 Appellant's fourth point Batson (1) challenge is based upon the State's use of a peremptory
challenge against a black member of the jury panel, Raysylvan Polk. In Batson, of course, the
United States Supreme Court held that the State's purposeful or deliberate denial of jury
participation to persons because of race violates a defendant's rights under the Equal Protection
Clause of the United States Constitution. Thus, if the defendant raises an inference of purposeful
discrimination through the State's use of its peremptory strikes, and the trial court determines that
a prima facie case of discrimination exists, then the burden shifts to the prosecutor who must come
forward with a neutral explanation for the challenges. Keeton v. State, 724 S.W.2d 58, 65
(Tex.Crim.App. 1987). Parenthetically, an appellate court will not review the issue of whether
an appellant has established a prima facie case unless the ruling on the prima facie case stops the
fact finding process. Rousseau v. State, 824 S.W.2d 579, 581 (Tex.Crim.App. 1992), cert.
denied, ___ U.S. ___, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993).


 In this case, the question presented is whether the State sufficiently rebutted the prima facie
case by presenting racially neutral explanations for its peremptory challenge to this juror. In
determining that question at the trial level, the judge must examine each of the prosecutor's
asserted reasons for striking a potential juror within the circumstances of the case in order to
determine if the neutral explanation given for the strike is really a pretext for a racially motivated
challenge. In making its determination, the trial court must ascertain whether the prosecutor has
articulated a "clear and reasonably specific" explanation of "legitimate reasons" for the challenged
strikes. See Batson, 476 U.S. at 98; Keeton v. State, 749 S.W.2d 861, 867-68 (Tex.Crim.App.
1988). The trial court's determination that the prosecution has rebutted the prima facie case will
not be reversed on appeal unless it is clearly erroneous. Whitsey v. State, 796 S.W.2d 707, 727
(Tex.Crim.App. 1989) (opinion on motion for rehearing). A finding is clearly erroneous when
the reviewing court, after considering the entire evidence, is left with the definite and firm
conviction that a mistake has been committed. Id. at 721-22.


 The prosecutor asserted that he struck Polk because he previously had criminal charges
against him which were subsequently dropped and because he had stated on his jury questionnaire
that he did not believe someone could get a fair trial in Dallas County. The prosecutor also stated
that there were thirty-four potential jurors on the panel. Of the thirty-four, four were African-American and of those four, two were struck and two were on the jury. In making its finding that
the State had advanced sufficiently race-neutral explanations for its strikes, the trial court
particularly noted Polk's remarks about the inability to get a fair trial in Dallas County.


 In contending the trial court erred, appellant admitted that during the voir dire
examination, Polk said that he had been arrested for assaulting his wife but that she later dropped
the charges. However, Polk stated he did not believe the incident would affect his ability to be
a fair and impartial juror. He also gave a negative response to the prosecutor's follow-up question
as to whether he knew of any other reason why he could not be fair and impartial. Appellant
concludes this record is sufficient to show the State's reason for striking Polk must have been
racial and emphasizes the rule that a racial motivation for striking black jurors requires reversal
even if other black jurors sat on the trial jury. See Keeton, 724 S.W.2d at 65-66.


 In Williams v. State, 804 S.W.2d 95 (Tex.Crim.App. 1991), cert. denied, 501 U.S. 1239,
111 S.Ct. 2875, 115 L.Ed.2d 1038 (1991), the Texas Court of Criminal Appeals explicated a set
of factors to be used in determining whether the State's explanations for the use of its peremptory
strikes were sufficiently race neutral. Those factors are:


 1. The reason given for the peremptory challenge is not related to the facts of the
case;


 2. there was a lack of questioning to the challenged juror or a lack of meaningful
questions;


 3. Disparate treatment--persons with the same or similar characteristics as the
challenged jurors were not struck;


 4. Disparate examination of members of the venire, i.e., questioning a challenged
juror so as to evoke a certain response without asking the same question of other
panel members;


 5. an examination based on a group bias where the group trait is not shown to
apply to the challenged juror specifically.


Id. at 106.


 With regard to the first factor, the prior criminal charge against Polk for assault against
his wife was related to the charges in theses cases only in the sense that both involved violence,
although considerably different degrees of violence. However, consideration of that experience
would support a reasonable, justifiable, and racially neutral inference that the juror might not be
favorably impressed with the criminal justice system in Dallas County. This is particularly true
in view of Polk's statement on the jury questionnaire.


 With regard to the second factor, Polk was questioned before the entire jury panel and his
statement about the dropped charges was made before that panel. The entire panel was then
queried whether anything about such an experience would tend to bias them and elicited no
affirmative response. Defense counsel also queried Polk about the possible effect of the charge
before the entire panel so there was no necessity for an additional individual examination of the
juror before the judge.


 With regard to the third factor, the record reveals that the State struck another juror,
Shirley Benson, who had previously been on probation for a drug offense even though she stated
that she was not mad about the charge and took responsibility for her own actions. Although
several other persons on the panel who had indicated that either they or a family member had been
charged, arrested, or convicted of a crime were not struck from the panel, there is nothing in the
record indicating that any other person on the panel had expressed the opinion that a defendant
could not receive a fair trial in Dallas County. Where the State has offered more than one
plausible reason for striking a venireman, it is proper to review those reasons in their entirety to
determine whether the State's action was valid or merely pretextual. Thus, the mere fact that
there were other jurors remaining on the panel who possessed one or more of the same
objectionable attributes of the stricken juror is not sufficient, of itself, to establish a racial bias. 
Cantu v. State, 842 S.W.2d 667, 669 (Tex.Crim.App.--1992), cert. denied, ___ U.S. ___, 113
S.Ct. 3046, 125 L.Ed.2d 731 (1993). Again, Polk's expression of his doubt about the fairness
of the trial system in Dallas County placed him in a unique, and justifiably cognizable, position
in the panel.


 With regard to the fourth factor, the prosecutor questioned the entire panel about any
experiences they may have had with the criminal system and any resulting bias they might feel
without singling Polk out. In fact, the specifics about the incident in question were elicited by the
defense, not the State. Under the record, the only jurors individually examined by the trial judge
were Benson, who was struck by the State, and Lys Moorman, who confessed to receiving a
traffic violation. The record does not show disparate examination of Polk. The fifth factor
suggested by the Williams court is not applicable to this appeal.


 In summary, after reviewing the record and considering the factors to be used in weighing
the evidence, we cannot say that the trial court clearly erred in overruling the Batson challenge. 
Accordingly, appellant's fifth point is overruled.


 In summary, all of appellant's points are overruled and, there being no reversible error,
the judgment of the trial court is affirmed.


 John T. Boyd

 Justice


Do not publish.

 
1. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 Ed.2d 69 (1986).