Affirmed and Majority and Concurring Opinions filed September 27, 2007








Affirmed
and Majority and Concurring Opinions filed September 27, 2007.

 

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-00764-CR

____________

 

CHRISTOPHER LEE KENNY, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 183rd
District Court

Harris County, Texas

Trial Court Cause No. 1077292

 



 

M A J O R I T Y   O P I N I O N

A jury convicted appellant Christopher Lee Kenny of
kidnapping, and the trial court assessed punishment at two years= confinement.  In
five issues, he challenges the legal and factual sufficiency of the evidence to
support the jury=s finding on the element of abduction and
complains the trial court erred in refusing to instruct the jury on various
defenses.  We affirm.  








I.  Factual and Procedural Background

Appellant and the complainant dated and lived together at a
residence in Katy, Texas.  On the evening of June 21, 2005, he and the
complainant went to dinner at a local restaurant where he drank one-and-a-half
bottles of sake and she drank two to three glasses of wine.  During dinner, a
dispute arose over the couple=s finances, and appellant stopped talking
to the complainant.  After they finished, appellant and the complainant drove
home without speaking to one another in the car.

At trial, the complainant and appellant offered differing
versions of the events occurring thereafter.  The complainant testified that
she tried to speak to appellant when they returned home, but he would not
respond.  After twenty or thirty minutes, without telling appellant, she left
and drove to a pub Aup the road.@  The complainant
stated that she stayed at the pub for about two or three hours, having
approximately three or four glasses of wine and talking to other patrons.  At
some point, the complainant observed appellant enter the pub, smile and wave at
herCwhich Ascared@ herCand then sit
directly across from her position at the bar.  Later, as appellant approached
the complainant to access a cigarette machine located behind her, she asked him
why he would not sit by her, and he did not respond.  Appellant then returned
to his seat, had a drink, talked to other patrons, and smiled at the
complainant.  She stated that appellant=s behavior made
her a Alittle nervous.@  Appellant left
after having a Acouple of drinks@ and without
speaking to the complainant.

Thereafter, a man who the complainant had talked to at the
pub offered to give her a ride home.  She accepted because she was Atipsy@ and felt that she
probably should not drive.  Around midnight, the man drove her to a rental
house he owned, rather than her house, because she explained to him she was
nervous about going home because of appellant=s behavior.  She
stayed at the house and drank water with the man for about twenty or
twenty-five minutes.  After the man made an unsolicited sexual advance at her,
which she rejected, he drove her back to her car in the pub=s parking lot
after midnight.  








According to the complainant, when she exited the man=s car, she
observed appellant standing by her car holding a rope.  As she attempted to
enter her car, appellant yelled at her, grabbed her arm, pulled her to his
pickup truck, opened the truck=s passenger door, and forced her inside. 
The complainant stated that by this point, the man who dropped her off had left
the premises, and no one else in the parking lot witnessed these events.  She
further explained that at this point she could have, but did not remember,
trying to get out of the truck.  Appellant then walked to the driver=s side of his
truck, got inside, and began tying the complainant=s wrists Aextremely tightly@ together with the
rope.  The complainant reacted by biting appellant on his left forearm.  She
claimed that appellant then threw her against the seat, pinning her there with
his hands, and placed some excess rope from her wrists around her neck for
about four or five seconds, which caused her pain and prevented her from
breathing.  At this point, the complainant, fearing for her life, decided to
cooperate with appellant and A[j]ust sit there and let him do what he
was going to do to [her].@  When appellant released the rope from
the complainant=s neck, he used it to tie her ankles
together in such a way that her ankles and wrists were now connected and he
could control the tightness of this connection using the end of the rope.[1] 
This caused the complainant excruciating pain, which she described as feeling
like her Aknees [were] coming out of the socket,@ and she screamed
to appellant, APlease stop.@  According to the
complainant, appellant responded, AWait till I get
you home.  I=m going to torture you more.@  Appellant then
drove home, using one hand to drive and the other to hold the end of the rope. 
When they arrived home, the complainant stated that appellant pulled her out of
the truck=s driver=s side and forced
her to hop inside as he continued to manipulate the tightness of the rope.  








When inside the home, appellant told the complainant to sit
down in the kitchen while he made coffee, which he forced her to drink, and he
then verbally abused her.  She explained that the ropes had loosened now, which
allowed her to hold the cup of coffee.  Thereafter, according to the
complainant, as she began walking up the stairs, she said something to anger
appellant, and he Acame after@ her.  In the
bedroom, appellant pinned the complainant down on the bed and spanked her.  She
claimed that appellant then said, ALet=s see what stuff
he=s been doing,@ and forced his
fingers into her vagina.  Eventually, appellant and the complainant went to
sleep.  In the morning, when appellant had left for work, the complainant
called her sister to inform her of the previous night=s events.  Upon
her sister=s advice, the complainant contacted the police.  The
complainant also contacted one of her employees, Betty Dudley, who came to her
house.  Dudley helped the complainant write a statement for the police when
they arrived because her wrists were too swollen to write. 

On cross-examination, the complainant admitted that after
the man had dropped her off in the pub=s parking lot,
appellant told her, AWhy would you go off with a stranger
because you could have been hurt like the idiot girl in Aruba?@  The complainant
further conceded that, when appellant put her inside his truck, she hoped he
would just take her home and not harm her, but she explained that she also
wanted to drive herself home because she was scared of appellant.  With the
exception of some details,[2]
Dudley, the complainant=s sister, two of the police officers who
responded to the complainant=s call the morning after the incident, and
a forensic nurse examiner who examined the complainant=s injuries,
largely corroborated the complainant=s version of the
events with their testimony at trial, including injuries to her wrists, ankles,
and neck.








According to appellant, who served as the defense=s sole witness, he
went to the pub looking for the complainant after unsuccessfully trying to
reach her on her cell phone.  He looked for her for about five minutes after
entering the pub and noticed her sitting across from him only after he had
ordered a drink and sat down at the bar.  He admitted waving to her when he saw
her, but denied doing so to intimidate her.  When she motioned him to come sit
with her, he similarly motioned her to sit by him, but she refused.  Upon
seeing the complainant summon the bartender to pay her tab, appellant left and
drove home, assuming he would see her there later, and went to sleep.  He awoke
at 1:00 a.m., checked his cell phone, and noticed he had three missed calls
from the complainant.  He tried to call her, but she did not answer, and,
concerned, he decided to drive back to the pub to look for her.  Although
appellant saw her car parked in the same spot, he could not find her inside the
pub.  After walking to a nearby convenience store to look for the complainant,
he received a call from her stating that she was coming home but failing to
specify where she was located.  As appellant returned to the pub=s parking lot, he
observed her walking towards him in an uncoordinated manner from the far end of
the lot.  Appellant noted that her dress looked disheveled, she had bloodshot,
glazed-over eyes, and her breath smelled like Aturpentine and
cigarettes.@  Appellant concluded that the complainant was
intoxicated and Aappeared to be a danger to anything on the
road.@  He told her he
was going to drive her home, but she attempted to get in her car and repeated
that she was Agoing home,@ that he could
follow her in his truck, and that she knew how to drive drunk.  He claims he
then helped her walk to his truck by steadying her with his hands.  As
appellant attempted to open the passenger side door, the complainant leaned her
forehead against the truck with her eyes closed and looked as though she Awas kind of
drifting off.@  








After the complainant sat down in the passenger seat and
appellant had closed the door, he said to her from outside the vehicle, AIt=s 1:00 o=clock in the
morning.  I can=t believe this shit.@  The complainant
then opened the passenger=s side door, and, while she sat in the
truck and he stood outside, an argument ensued in which she reiterated that she
knew how to drive drunk and appellant should follow her home.  Eventually,
appellant shut the door, and walked back to the driver=s side of the
truck.  The complainant again opened the passenger=s side door, and a
further argument ensued.  At this point, because he thought the complainant
clearly intended to drive and Adidn=t see much option,@ appellant took a
work rope from the back of his truck, demanded the complainant put forward her
wrists, and formed a loop around her wrists with the rope.  Appellant then
started the ignition, reversed, and, as he pulled forward, he claims the
complainant loosened the rope around her wrists, reached across to the driver=s side, and bit
his left arm.  In response, he pushed her back into her seat.  After the
complainant repeatedly kicked the glove compartment, appellant eventually
retied the complainant=s wrists again with the rope and held the
end of the rope, and he claims she was Acomplacent@ when he did so. 
Appellant denied ever tying the complainant=s feet together or
using the rope to choke her.  Appellant further denied ever telling the
complainant that he would Atorture her more@ at home.

Upon arriving home, appellant let the complainant out the
driver=s side door,
untied the rope from her wrists, and helped her inside.  He retrieved a chair
from the living room, told her to sit down, and made her coffee.  Eventually,
when they retired to the bedroom upstairs, the complainant went to the bathroom
for twenty minutes and would not respond to appellant=s calls for her
name.  When she came out, appellant claims she made a comment about his lack of
concern for where she was, and he Agave her a couple
of pops on the hiney@ in response.  He denied ever placing his
fingers inside her vagina. 








The State indicted appellant for aggravated kidnapping,[3]
initially alleging he Aintentionally and knowingly abduct[ed] . .
. the Complainant, . . . without [her] consent, with intent to prevent [her]
liberation by secreting and holding [her] in a place where [she] was not likely
to be found and with intent to violate and abuse [her] sexually and terrorize .
. . and inflict bodily injury on [her].@  The State later
modified the indictment to allege that appellant Aintentionally and
knowingly abduct[ed] . . . the Complainant, . . . with intent to violate and
abuse [her] sexually and inflict bodily injury on [her].@  At the close of
evidence at trial, the trial court charged the jury on aggravated kidnapping
and the lesser-included offenses of kidnapping and unlawful restraint but
refused appellant=s request to instruct the jury on the
defenses of necessity, protection of life or health, and confinement as
justifiable force.  The jury acquitted appellant of aggravated kidnapping but
convicted him of kidnapping.  

Appellant now complains the evidence is legally and
factually insufficient to support the jury=s finding on the
abduction element of kidnapping and that the trial court erred in refusing to
instruct the jury on the defenses to kidnapping. 

II.  Legal and Factual Sufficiency

In issues one and two, appellant contends the evidence is
both legally and factually insufficient to support the jury=s finding that
appellant abducted the complainant.  In evaluating a legal sufficiency claim
attacking a jury=s finding of guilt, we view the evidence
in the light most favorable to the verdict.  Wesbrook v. State, 29
S.W.3d 103, 111 (Tex. Crim. App. 2000).  We do not ask whether we believe the
evidence at trial established guilt beyond a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307, 318B19 (1979).  Rather, we determine only
whether a rational trier of fact could have found the essential elements of the
crime beyond a reasonable doubt.  Cardenas v. State, 30 S.W.3d 384, 389
(Tex. Crim. App. 2000).  In our review, we accord great deference A>to the
responsibility of the trier of fact [to fairly] resolve conflicts in the
testimony, to weigh the evidence, and to draw reasonable inferences from basic
facts to ultimate facts.=@  Clewis v.
State, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996) (quoting Jackson,
443 U.S. at 319). 








In conducting a factual sufficiency review of the jury=s determination,
we do not view the evidence Ain the light most favorable to the
prosecution.@  Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim.
App. 1997). Rather, we look at all evidence in a neutral light and will reverse
only if (1) the evidence is so weak that the finding seems clearly wrong and
manifestly unjust or, (2) considering conflicting evidence, the finding, though
legally sufficient, is nevertheless against the great weight and preponderance
of the evidence.  See Watson v. State, 204 S.W.3d 404, 414B15 (Tex. Crim.
App. 2006).  However, it is not enough that we may harbor a subjective level of
reasonable doubt to overturn a finding that is founded on legally sufficient
evidence.  See id. at 417.  We cannot conclude that a finding is Aclearly wrong@ or Amanifestly unjust@ simply because,
on the quantum of evidence admitted, we would have voted differently had we
been the fact finder.  See id.  Nor can we declare that a conflict in
the evidence justifies a new trial simply because we may disagree with the
factfinder=s resolution of that conflict.  See id.  Rather,
before ordering a new trial, we must first be able to say, with some objective
basis in the record, that the great weight and preponderance of the (albeit
legally sufficient) evidence contradicts the verdict.  See id.

A person commits kidnapping if he intentionally or
knowingly abducts another person.  Tex.
Penal Code Ann. ' 20.03(a) (Vernon 2003).  AAbduct@ means to restrain
a person with intent to prevent his liberation by (a) secreting or holding him
in a place where he is not likely to be found or (b) using or threatening to
use deadly force.  See id. ' 20.01(2) (Vernon
2003).  Appellant contends there is legally and factually insufficient evidence
that he intended to prevent the complainant=s liberation by
secreting or holding her in a place where she was not likely to be found under
section 20.01(2)(A) of the Penal Code.  He correctly notes that the application
paragraph of the court=s charge on kidnapping expressly limits
the manner of abduction to Asecreting@ under section
20.01(2)(A); as such, he contends the State may not now rely on the Adeadly force@ manner of
abduction under section 20.01(2)(B).  Notwithstanding the jury charge, he
argues Ain an abundance of
caution@ that there is
legally and factually insufficient evidence to support a finding of abduction
under a Adeadly force@ theory.  We
address appellant=s sufficiency arguments under the
alternative theories of abduction in turn.  

A.  Secreting








The requirement of secreting the victim or holding her in a
place where she is not likely to be found is a part of the mens rea of the
offense, not the actus reus.  Brimage v. State, 918 S.W.2d 466, 475B76 (Tex. Crim. App.
1994).  Thus, once restraint has been proven, the offense of kidnapping is
complete when the actor evidences a specific intent to prevent liberation in
this manner.  See id.  Accordingly, the State need not prove the actor
accomplished a restraint by secretion but only that the actor completed a
restraint and evidenced a specific intent to prevent liberation by secretion.  See
id. at 476.  Intent can be inferred from an accused=s conduct,
remarks, and the surrounding circumstances.  See Turner v. State, 600
S.W.2d 927, 929 (Tex. Crim. App. 1980); Murchison v. State, 93 S.W.3d
239, 254 (Tex. App.CHouston [14th Dist.] 2002, pet. ref=d).

Appellant argues that the evidence shows only that
appellant intended to take the complainant to their home and that it is Ahard to imagine a
situation where taking someone to his or her residence can be consistent with
having the intent to secrete them in a place they were not likely to be found.@  The State
counters that the Court of Criminal Appeals has held that a moving car can
constitute a place where the victim is not likely to be found under section
20.01(2)(A).  See Sanders v. State, 605 S.W.2d 612, 614 (Tex. Crim. App.
1980); see also Wilson v. State, 863 S.W.2d 59, 66B67 (Tex. Crim.
App. 1993); Fann v. State, 696 S.W.2d 575, 576 (Tex. Crim. App. 1985). 
Thus, the State argues, appellant both expressed the required intent to secrete
the complainant and completed the abduction when he forced the complainant into
his truck, and his later act of taking her back their residence does not negate
such abduction. 








We agree with appellant that there is legally and factually
insufficient evidence that he intended to prevent the complainant=s liberation by
secreting or holding her in a place where she was not likely to be found.  The
crux of appellant=s case rested on his stated intention to
drive the complainant back to their home, and no testimony or other evidence
controverted appellant=s statements.  Indeed, the complainant
testified that appellant told her he intended to take her homeCalbeit to Atorture@ herCand that she
desired to drive herself home.[4] 
The State does not cite, and we have not found, any authority holding that a
victim=s own residence
can constitute a Aplace where [the victim] is unlikely to be
found@ and that, by
extension, an expressed intention to take the victim home could satisfy the
secreting requirement under section 20.01(2)(A).  See Schweinle v. State, 915 S.W.2d 17, 19 (Tex. Crim. App.
1996) (holding that rational jury could have believed that defendant=s house, where complainant was held
against her will, did not constitute place where complainant was not likely to
be found because there was evidence that complainant had key to house, had
formerly lived there, and had spent night there past three or four nights
before offense).  Even assuming a victim=s own residence could constitute such
a place under the statute, we do not find any facts in this record to justify
such a conclusion here.








Moreover,
we reject the State=s suggestion that the evidence shows appellant intended to
secrete or hold the complainant in his truck and that appellant had thus completed the
abduction before transporting her back to their home.  While we agree that a
moving car can constitute a place the victim will not likely be found, we find
the cases the State cites in support of this assertion distinguishable.  Wilson,
Fann, and Sanders each involved strangers abducting children and
driving them either aimlessly around a city or to an unfamiliar, remote
destination, which effectively isolated the victims from those who could find
or assist them.  See Wilson, 863 S.W.2d at 66B67; Fann,
696 S.W.2d at 576; Sanders, 605 S.W.2d at 613B14.  From this
conduct and the surrounding circumstances, the courts inferred that the
appellants intended to secrete or hold the victims in a place where they were
unlikely to be found.  Here, however, appellant drove his adult girlfriend
directly from a local pub to their nearby residence, a place she desired to go
and that, as noted, does not constitute a place where she was unlikely to be
found under these facts.  More importantly, unlike the above cases where the
courts inferred intent to secrete largely from the appellants= conduct and the
surrounding circumstances, appellant repeatedly verbalized his intent to take
the complainant to their home.  Indeed, the evidence indicates that appellant
and the complainant primarily disputed how she would go home, not whether she
would go home.  Additionally, there is no evidence that appellant affirmatively
sought to isolate the complainant from people who could potentially render aid
to her.  Compare Megas v. State, 68 S.W.3d 234, 237 (Tex. App.CHouston [1st
Dist.] 2002, pet. ref=d) (finding legally and factually
sufficient evidence of intent to secrete where, during physical and verbal
altercation in which appellant=s girlfriend attempted to exit appellant=s parked car on
side of highway, appellant dragged girlfriend back into car and drove away from
motorist who had stopped to render aid).  Based on appellant=s conduct, his
remarks, and the unusual circumstances surrounding the incident, we cannot
conclude that one could reasonably infer that appellant intended to secrete or
hold the complainant in his truck within the meaning of section 20.01(A)(2).  See
Turner, 600 S.W.2d at 929; Murchison, 93 S.W.3d at 254.  

We therefore hold that there is legally insufficient
evidence that appellant abducted the complainant with intent to prevent her
liberation by secreting or holding her in a place where she was not likely to
be found.  We now turn to the alternative Adeadly force@ manner of
abduction under section 20.01(2)(B).

B.  Using or Threatening Deadly Force








We initially address whether we may review the sufficiency
of the evidence of abduction under the alternative Adeadly force@ definition in
section 20.01(2)(B) in light of the indictment and charges presented to the
jury.  The abstract portion of the aggravated kidnapping jury charge includes
both the secreting and deadly force definitions of abduction, and the
application paragraph simply invokes the term Aabduct.@  The abstract
portion of the kidnapping charge defines the offense using the term Aabducts@; however, the
application paragraph of the charge reads, A[I]f you find from
the evidence beyond a reasonable doubt that . . . [appellant] . . . unlawfully,
intentionally or knowingly abduct [the complainant], without her consent, with
intent to prevent her liberation by secreting or holding [the complainant] in a
place where [she] was not likely to be found, then you will find
[appellant] guilty of kidnapping@ (emphasis
added).  Therefore, the application paragraph of the jury charge on kidnapping
expressly authorized a conviction only under the secreting manner of abduction
pursuant to section 20.01(2)(A).  For this reason, appellant contends we may
not conduct a sufficiency review of the jury=s findings on
abduction under the alternative deadly force definition in section
20.01(2)(B).  

However, the Court of Criminal Appeals has established that
we do not measure the sufficiency of the evidence by the jury charge actually given
but, rather, by the elements of the offense as defined by the hypothetically
correct jury charge.  See Malik v. State, 953 S.W.2d 234, 239B40 (Tex. Crim.
App. 1997); see also Gollihar v. State, 46 S.W.3d 243, 252 (Tex. Crim.
App. 2001).  Such a charge Aaccurately sets out the law, is authorized
by the indictment, does not unnecessarily increase the State=s burden of proof
or unnecessarily restrict the State=s theories of
liability, and adequately describes the particular offense for which the
defendant was tried.@  Malik, 953 S.W.2d at 240.  The Alaw@ as Aauthorized by the
indictment@ is the statutory elements of the offense as modified
by the charging instrument.  See Curry v. State, 30 S.W.3d 394, 404
(Tex. Crim. App. 2000).  This standard ensures that a judgment of acquittal is
reserved for those situations in which there is an actual failure in the State=s proof of the
crime rather than a mere error in the jury charge submitted.  See Malik,
S.W.2d at 240.








The question thus becomes whether the hypothetically
correct jury charge on kidnapping would include the deadly force manner of
abduction in addition to secreting.  The aggravated kidnapping indictment
alleged abduction without specifying the particular statutory manner or means
of establishing abduction outlined in section 20.01(2).  Although the State
must generally specify the type of abduction it seeks to prove, appellant did
not move to quash the indictment or otherwise object to its validity, and thus,
he may not now allege the indictment was flawed for failing to give him notice
of the charges.  See Teal v. State, No. PD‑0689‑06, ___
S.W.3d ____, 2007 WL 676221, at *3 (Tex. Crim. App. Mar. 7, 2007) (holding that
defendant must object to any error in indictment before trial); Curry,
30 S.W.3d at 403 (A[T]he State must allege, in the face of
a motion to quash, which type of abduction it seeks to prove in order to
give the defendant notice.@ (emphasis added)); Fann, 696
S.W.2d at 576 (rejecting argument that indictment was fundamentally defective
for failing to define Aabduct@ where appellant
failed to file motion to quash).  Therefore, because the aggravated kidnapping
indictment is not restricted to either manner of abduction under section
20.01(2), we conclude the hypothetically correct jury charge would authorize
conviction for the lesser-included offense of kidnapping under either theory of
abduction.  See Malik, 953 S.W.2d at 240 (holding that hypothetically
correct jury charge Adoes not unnecessarily restrict the State=s theories of
liability@); see also Swartz v. State, 61 S.W.3d 781, 785B86 (Tex. App.CCorpus Christi
2001, pet. ref=d) (applying hypothetically correct jury charge
analysis and conducting sufficiency review under principal and party theories
of credit card abuse where indictment and abstract portion of jury charge
alleged both theories but application paragraph alleged only party theory);  Marvis
v. State, 3 S.W.3d 68, 73B74 (Tex. App.CHouston [14th
Dist.] 1999) (applying hypothetically correct jury charge analysis and
conducting sufficiency review under party theory of murder where application
paragraph alleged only principal theory), rev=d on other grounds, 36 S.W.3d 878
(Tex. Crim. App. 2001); Howard v. State, 966 S.W.2d 821, 824B25 (Tex. App.CAustin 1998, pet.
ref=d) (applying hypothetically
correct jury charge analysis and conducting sufficiency review under party
theory of attempted murder where charge included party instruction but
application paragraph did not).[5]  









Having determined that the hypothetically correct jury
charge would have authorized a conviction for kidnapping under the deadly force
manner of abduction, we now address whether there is legally and factually[6]
sufficient evidence to support a conviction under such theory.  Abduction under
section 20.01(2)(B) is established by evidence that a party intended to prevent
the complainant=s liberation by using or threatening to
use deadly force.  See Tex. Penal
Code Ann. ' 20.01(2)(B).  ADeadly force@ is either force
intended or known by the actor to cause death or serious bodily injury or force
capable of causing death or serious bodily injury in the manner of its use or
intended use.  See Ferrel v. State, 55 S.W.3d 586, 591B92 (Tex. Crim.
App. 2001).  Threats may be communicated by actions, words, or deeds, including
Aacts amounting to
an offer to use future force.@  See Rogers v. State, 550 S.W.2d
78, 81 (Tex. Crim. App. 1977).

Appellant claims there is no evidence he intended to
prevent the complainant=s liberation by using deadly force because
he only spanked, tied up, and verbally abused her, all of which he suggests
were not capable of causing death or serious bodily injury.  He further
contends there is no evidence he intended to prevent her liberation by
threatening deadly force because his only conceivable threat, his alleged
statement that he would torture the complainant when they returned home, came
after he had restrained her and was thus not intended to prevent her
liberation.  He additionally asserts that even if he made the torture threat,
it was simply an aside, frustrated Abrow-beating,@ and, given that
actual torture did not accompany the comment, the context indicates Ait was never meant
to be taken literally.@








We disagree with appellant=s contentions for
several reasons.  First, appellant ignores the complainant=s testimony that
he placed the rope around her neck for four or five seconds, at which point she
stated she could not breath and her Alife flashed
before [her] eyes.@  Although appellant denied ever placing
the rope around her neck, the jury was free to believe the complainant=s testimony over
appellant=s, and her recollection that appellant placed the rope
around her neck finds corroboration in both testimony from the officers,
Dudley, and the nurse and a medical report showing a six-centimeter Apoint tenderness@ injury to the
front of her neck.[7] 
See Duvall v. State, 59 S.W.3d 773, 778 (Tex. App.CAustin 2001, pet.
ref=d) (holding that
choking complainant constituted sufficient act to establish threat of deadly
force); Ramos v. State, No. 14‑94‑01188‑CR, 1997 WL
59333, at *2B3 (Tex. App.CHouston [14th
Dist.] Feb. 13, 1997, pet. ref=d) (not designated for publication)
(holding that rational jury could conclude appellant intended to prevent victim=s liberation by
use of deadly force where he, among other things, drove her to isolated
location and strangled her until she lost consciousness).  Second, in
contending that his threat to torture the complainant could not have prevented
her liberation, appellant disregards the complainant=s testimony that
he made the threat shortly after she had bitten him on the arm, which the jury
could have rationally inferred was an attempt to liberate herself.  Finally, as
to appellant=s contention that his threat to torture the
complainant was never meant to be taken literally, such a determination goes to
the weight and credibility of the evidence, and we conclude that a rational
factfinder could have determined, based on appellant=s prior
assaultative conduct, that appellant=s threat was
credible.  See, e.g., Lebleu v. State, 192 S.W.3d 205, 208B12 (Tex. App.CHouston [14th
Dist.] 2006, pet. ref=d) (rejecting appellant=s contentions that
evidence was legally and factually insufficient to support intentional threat
of harm element of retaliation because evidence showed his threats were mere Apuffing@ and that he often
made dramatic statements, as it was jury=s role to evaluate
competing theories as to meaning of appellant=s words). 

We therefore hold that there is legally and factually
sufficient evidence that appellant abducted the complainant with intent to
prevent her liberation by using or threatening deadly force and accordingly
overrule issues one and two.  Because we find sufficient evidence to support
appellant=s conviction for kidnapping, we must now turn to
whether the trial court nonetheless committed reversible error in refusing to
instruct the jury on defenses to kidnapping.  

III.  Defenses








In issues three through five, appellant complains that the
trial court erroneously refused to submit instructions he requested on the
defenses of necessity, protection of life or health, and confinement as justifiable
force to the jury.  An accused is entitled to an instruction on every defensive
issue raised by the evidence.  Hayes v. State, 728 S.W.2d 804, 807 (Tex.
Crim. App. 1987).  This is true regardless of whether such evidence is strong
or weak, unimpeached or contradicted, and regardless of what the trial court
may or may not think about the credibility of this evidence.  Id.  A
defendant=s testimony alone is sufficient to raise a defensive
issue requiring an instruction in the jury charge.  Id.  We review the
evidence in support of the defensive issue in the light most favorable to the
defense.  See Stefanoff v. State, 78 S.W.3d 496, 501 (Tex. App.CAustin 2002, pet.
ref=d).[8]


Finding significant overlap between each of the defenses
raised by appellant, we will address them together.  Regarding the defense of
necessity, the Penal Code provides that conduct is justified if

(1) the actor reasonably believes the conduct is immediately necessary
to avoid imminent harm;

(2) the desirability and urgency of avoiding the harm clearly outweigh,
according to ordinary standards of reasonableness, the harm sought to be
prevented by the law proscribing the conduct; and

(3) a legislative purpose to exclude the justification claimed for the
conduct does not otherwise plainly appear.








Tex. Penal Code Ann. ' 9.22 (Vernon
2003).  Regarding the defense of protection of life or health, the Penal Code
provides that A[a] person is justified in using force, but not deadly
force, against another when and to the degree he reasonably believes the force
is immediately necessary to prevent the other from committing suicide or
inflicting serious bodily injury to himself.@  Id. ' 9.34(a) (Vernon
2003).  Therefore, both defenses share the common element of Aimmediate
necessity.@[9]  A>Imminent= means something
that is impending, not pending; something that is on the point of happening,
not about to happen.@  Schier v. State, 60 S.W.3d 340,
343 (Tex. App.CHouston [14th Dist.] 2001, pet. ref=d).  AAn >imminent harm= occurs when there
is an emergency situation and it is >immediately
necessary= to avoid that harm, when a split‑second
decision is required without time to consider the law.@  Id.  A
defendant=s belief that conduct was immediately necessary to
avoid imminent harm may be deemed unreasonable as a matter of law if undisputed
facts demonstrate a complete absence of evidence of immediate necessity or
imminent harm.  Arnwine v. State, 20 S.W.3d 155, 160 (Tex. App.CTexarkana 2000, no
pet.); Brazelton v. State, 947 S.W.2d 644, 648B49 (Tex. App.CFort Worth 1997,
no pet.).  Regarding the Adefense@ of confinement as
justifiable force, the Penal Code provides that confinement is justified when
force is justified under Chapter Nine of the Code if the actor takes reasonable
measures to terminate the confinement as soon as he knows he safely can unless the
person confined has been arrested for an offense.  See Tex. Penal Code Ann. ' 9.03 (Vernon
2003); see also Adelman v. State, 828 S.W.2d 418, 421 (Tex. Crim. App.
1992). 

Appellant contends that Athere clearly was
some evidence that the Complainant was about to drive herself home,@ which
necessitated her restraint because of the probable result that someone would Aget[] hurt@ if she drove in
her intoxicated condition.  He notes that the complainant admitted she was
going to get in her car, that she stated she wanted to drive herself home, and
that she attempted to exit the vehicle twice before appellant restrained her. 
He argues that this evidence shows he Awas reasonable in
concluding that the Complainant had every intention to drive herself home and
would do it soon.@








In contending that the complainant was Aabout to@ drive and would
drive Asoon,@ appellant
misinterprets the very definitions of Aimmediate[]
necessity@ and Aimminent harm,@ which expressly
exclude an event that is Aabout to happen.@  See Schier,
60 S.W.3d at 343.  Indeed, the record reveals a complete absence of immediate
necessity or imminent harm.  Appellant testified that he and the complainant
had argued for at least five minutes before he tied her wrists together when
she attempted to exit his vehicle for the second time.  As such, his own
testimony fails to indicate he made the decision to restrain the complainant in
a split-second without time to consider any legal alternatives, such as
requesting her car keys.  See Fuentes v. State, No. 11-05-00003-CR, 2006
WL 648343, at *2 (Tex. App.CEastland Mar. 16, 2006, pet. ref=d) (not designated
for publication) (holding trial court properly refused necessity instruction in
assault case for failure to raise fact issue on immediate necessity or imminent
harm where appellant wrestled his wife for car keys for twenty minutes in
attempt to keep her from driving car they occupied while intoxicated and
slapped her when vehicle was not moving and keys were not in ignition); Jordan
v. State, No. 03-02-00041-CR, 2002 WL 31083349, at *2B3 (Tex. App.CAustin Sept. 19,
2002, no pet.) (not designated for publication) (holding trial court properly
refused necessity instruction in assault case for failure to raise fact issue
on immediate necessity or imminent harm because (1) when appellant tussled with
his intoxicated girlfriend at their home to prevent her from taking his car
keys and driving, there was no evidence she was on verge of driving away, (2)
appellant waited five minutes after she left on foot to look for her, and, (3)
when appellant later found her at convenience store, there was no evidence she
was in imminent peril).  

Because the record reveals a complete absence of evidence
on the elements of immediate necessity or imminent harm, we hold that the trial
court properly refused to instruct the jury on the defenses of necessity under
section 9.22 and protection of life or health under section 9.34. 
Additionally, because appellant concedes that an instruction regarding
confinement as justifiable force under section 9.03 would only be appropriate
if an instruction under section 9.34 were, we conclude that, by extension, the
trial court properly refused to instruct the jury on confinement as justifiable
force under section 9.03.

We overrule issues three through five.  

 








IV.  Conclusion

We hold that the evidence is legally insufficient to
support appellant=s conviction for kidnapping under the
secreting theory of abduction included in the actual jury charge.  However, we
hold that the evidence is legally and factually sufficient to support appellant=s conviction under
the deadly force theory of abduction, based on the hypothetically correct jury
charge.  Finally, we hold that the trial court properly refused the
instructions on defenses to kidnapping because the evidence shows a lack of
immediate necessity or imminent harm.  Accordingly, we affirm the trial court=s judgment.  

 

 

 

 

/s/      Leslie B. Yates

Justice

 

 

 

 

Judgment rendered
and Majority and Concurring Opinions filed September 27, 2007.

Panel consists of
Justices Yates, Seymore, and Edelman* (Edelman, J., concurring).

Publish C Tex. R. App. P. 47.2(b).

 

 

 

 

 

 

 

*  Senior Justice
Richard H. Edelman sitting by assignment.

 









[1]  The complainant explained that appellant had Ahog-tied@
her.  





[2]  The most notable detail involved whether appellant
placed the rope around the complainant=s
neck as she stood outside of her car in the pub=s parking lot and then dragged her to his truck, the version that
Dudley and the two police officers recalled her recounting.  The nurse
examiner, on the other hand, recalled the complainant giving the same account
as she did at trial, in which appellant pinned her neck against the seat of his
truck using the rope.





[3]  The State also indicted appellant for sexual
assault, and the jury ultimately acquitted him of this charge.  





[4]  We acknowledge that the Court of Criminal Appeals
has held that voluntarily accompanying a defendant into a vehicle does not
preclude the possibility that the defendant may kidnap the victim during the
ride, but neither party suggests that the complainant in fact voluntarily
accompanied appellant into his truck before he drove home.  See Boyle v.
State, 820 S.W.2d 122, 138 (Tex. Crim. App. 1989). 





[5]   Compare Curry, 30 S.W.3d at 405 (holding that hypothetically
correct charge would have included deadly force allegation under Malik,
where indictment alleged deadly force theory of abduction but jury charge
omitted such allegation and failed to specify theory of abduction).





[6]  We continue to apply the hypothetically correct jury
charge analysis to both legal and factual sufficiency reviews until otherwise
directed by the Court of Criminal Appeals.  See Wooley v. State, 223
S.W.3d 732, 735 n.1 (Tex. App.CHouston [14th
Dist.] 2007, pet. filed); Villani v. State, 116 S.W.3d 297, 307 (Tex.
App.CHouston [14th Dist.] 2003, pet. ref=d).





[7]  The forensic nurse examiner explained that a Apoint tenderness@
injury represents an area on the body that the victim reports as tender and
that touching may cause the victim to jump or flinch.  She conceded that point
tenderness injuries contain no visible signs of injury. 





[8]  The parties debate whether appellant admitted the
offense charged, which is required to raise the defense of necessity.  See
Young v. State, 991 S.W.2d 835, 838 (Tex. Crim. App. 1999).  Because this
issue does not affect the outcome of our decision, we need not address it.  





[9]  Although we find no authority specifically
addressing whether the immediate necessity requirement under section 9.22 and
section 9.34 are governed by the same principles, both parties have so  assumed
in their briefs to this court.  See generally McGarity v. State, 5
S.W.3d 223, 225 (Tex. App.CSan Antonio
1999, no pet.) (noting that protection of life or health defense and necessity
defense both constitute Ajustification@
defenses under Chapter 9 and analogizing authority addressing necessity in
analyzing issue involving protection of health or life).  As such, they have
waived the right to complain otherwise.  See Tex. R. App. P. 33.1(a).